*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0033P (6th Cir.)
File Name: 00a0033p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | | |
| *v.* | | No. 98-3160 |
| 150 ACRES OF LAND, More or Less, Located in Medina County, Ohio, *Defendant-Appellant.* | | |

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 95-01009—Solomon Oliver, Jr., District Judge.

Argued: April 29, 1999

Decided and Filed: January 20, 2000

Before: JONES, BOGGS, and COLE, Circuit Judges.

———————

## COUNSEL

**ARGUED:** David S. Hoffmann, McMAHON, DeGULIS & HOFFMAN, Cleveland, Ohio, for Appellant. Jared A. Goldstein, U.S. DEPARTMENT OF JUSTICE, LAND & NATURAL RESOURCES DIVISION, Washington, D.C., for

1

Appellee.  **ON BRIEF:**  David S. Hoffmann, McMAHON, DeGULIS & HOFFMAN, Cleveland, Ohio, for Appellant. Jared A. Goldstein, James D. Freeman, U.S. DEPARTMENT OF JUSTICE, LAND & NATURAL RESOURCES DIVISION, Washington, D.C., for Appellee.

BOGGS, J., delivered the opinion of the court. JONES, J. (p. 23), delivered a separate concurring opinion. COLE, J. (pp. 24-27), delivered a separate opinion concurring in part and dissenting in part.

———————————

## OPINION

———————————

BOGGS, Circuit Judge.   The federal Environmental Protection Agency ("EPA") sued the Glidden Co. *in personam* and certain land owned by various members of the Bohaty family *in rem* under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, in connection with costs incurred in removing toxic wastes found on the land. Glidden settled with the EPA for a small fraction of the clean-up costs, and the Bohatys and the government cross-moved for summary judgment.  The district court granted summary judgment for the government, thereby perfecting a lien on the property under 42 U.S.C. § 9607(*l*)(1).  The Bohatys now appeal the judgment of the district court ordering the sale of the land and directing that the proceeds be used to satisfy the lien on the property.  We reverse the judgment of the district court in part, affirm in part, and remand the case for further proceedings.

## I

The land in question is approximately 150 contiguous acres of real estate in three parcels, located on Pearl Road in Medina County, Ohio.  It has been owned "for at least three generations" by the Bohaty family, which has operated a farm-equipment repair business at the extreme western edge.

property into appropriate units based on reasonable divisions and the bounds of contamination present on the property.  In the present case, I would hold that the facility is limited to Parcel 1, based on the divisibility of the property into natural units and the admission that no contamination was found outside of Parcel 1, and thus I would hold that the lien is proper only as it pertains to Parcel 1.

For the foregoing reasons, I respectfully **DISSENT** from Part II. C. of the majority opinion.

389, 395-96 (E.D. Va. 1994) (stating that what "matters for the purpose of defining the scope of the facility is where the hazardous substances were . . . disposed of . . . or have otherwise come to be located" and "the uncontradicted record confirms that hazardous substances exist . . . in all quadrants of the property") (footnotes and internal quotations omitted). In essence, the scope of contamination determined the scope of the facility.

Conversely, where the Fourth Circuit found that contamination was not widespread, the court limited the "facility" to include only the area where hazardous substances were located. *See, e.g.*, *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 843 (4th Cir. 1992) (stating that "the only 'area' where hazardous substances [had] 'come to be located' was in and around the storage tanks, so the relevant 'facility' [was] properly confined to that area").

This case presents land that is geographically distinct and while used in part as a dumping site, is admittedly not contaminated in its entirety. It is clear that no contamination was discovered outside of Parcel 1. Following this court's approach in *Brighton* and applying § 9601(9)(B), the facility under these facts should be limited to Parcel 1; the area of the entire contamination that is reasonably and naturally separable from Parcels 2 and 3.

Where the contamination is confined to a single parcel and there is no indication that dumping has occurred on connected parcels, this court should look to the metes and bounds of the contamination as a measure, at least in part, when defining the scope of the "facility" under 42 U.S.C. § 9601(9). *Cf. Brighton*, 153 F.3d at 313 (relying on scope of contamination); *Axel Johnson, Inc.*, 191 F.3d at 418-19 (examining scope of contamination and divisibility of land); *Nurad, Inc.*, 966 F.2d at 843 (relying on scope of contamination). If we are to apply the statutory language defining the "facility" under § 9601(9) and follow the teachings of *Brighton* with respect to limiting the "facility" at all, this case presents a clear opportunity to divide the

According to the district court's opinion, at the present time, Ethel Bohaty owns a 37/45 interest, and John Bohaty, Jr., Barbara Bohaty, Belinda Bohaty, and Susan Bohaty each own a 2/45 interest in the land. Each interest was entirely inherited except for that part of Ethel Bohaty's interest that is 12/45 of the land, which she purchased from relatives whose interests descended at the same time as her husband's. Ethel's father-in-law, John Bohaty, died on April 12, 1982, leaving one-half interest in the property to her husband Vencel (John), the interests now owned by John, Jr., Barbara, Belinda, and Susan to them, and the remainder to three other relatives. On January 27, 1984, Vencel died, leaving his entire interest to Ethel. On February 15, 1985, the three other relatives or their heirs sold their interests to Ethel.

On March 30, 1987, the local fire department noticed numerous fifty-five gallon drums on the property and notified the Ohio Environmental Protection Agency ("OEPA"). OEPA visited the property and noted approximately 300 abandoned drums containing paint waste, laboratory chemicals, and red sludge. OEPA's toxicity tests were negative. Ethel Bohaty stated that she asked the inspectors to inform her if the drums posed a problem, and that she did not hear from them.

On August 17, 1989, OEPA again inspected the property in connection with the City of Medina's appropriation of four acres for road construction. The inspection was not related to the 1987 inspection. Ethel Bohaty expressed her desire to get rid of any toxic substances that might be found. The inspectors found 200–300 drums, some of which were cause for concern, and five underground storage tanks; they suggested a follow-up inspection in the fall, when the vegetation would be less dense. The inspectors concluded, from historical aerial photographs, that organized drum placement had occurred from the mid-1950s through the early 1970s. Ethel Bohaty stated that the inspectors did not tell her that the drums contained hazardous materials or that she should remove them or take other precautions, and that OEPA

did not contact her further regarding the August 1989 inspection.

On September 16, 1991, OEPA requested assistance from the federal EPA. In October 1991, the EPA asked to inspect the property. On October 8, 1991, EPA inspectors conducted a preliminary inspection that identified approximately 400 drums. Later that afternoon, the inspectors took soil samples from various parts of the property. Laboratory analysis revealed that each of the samples exhibited flashpoints of less than 130 degrees Fahrenheit, therefore posing an ignitability hazard, as well as substantially acidic pH values. The EPA considered these results sufficient to justify a removal action under 40 C.F.R. § 300.415(b)(2).

The government presented evidence that Vencel Bohaty, Ethel's husband (now deceased) knew of the dumping and may have profited from it.[1] The living Bohatys presented unrebutted evidence that they did not know of the presence of drums on the property, other than those used in the farm-equipment repair business. Except for the extreme western edge of the property, the land was heavily vegetated, especially the area containing the drums. In fact, EPA inspectors often could not see the drums until they stumbled on them.

On December 16, 1991, the EPA sent John and Ethel Bohaty a notice of potential liability asking them to agree to pay for the response activities. The notice requested a response within five days. The Bohatys did not respond to the notice.

On January 15, 1992, the EPA began a removal operation on the property. Altogether, approximately 1000 drums were removed, of which approximately 550 contained waste and

---

[1]The EPA regional judicial officer found that the Bohatys had raised credibility issues concerning several affidavits and depositions proffered by the government in support of this claim "that defeat their usefulness to the EPA."

records, were transferred on the same land deed, and were maintained in similar undeveloped states. These factors are not determinative of the bounds of the facility. The words of the statute direct our inquiry to the determination of the bounds of the "site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9)(B). The case law conforms to this directive.

In *Brighton*, this court determined that the entire property was the "facility" in part because "it appear[ed] that the entire property was operated together as a dump." 153 F.3d at 313. Judge Moore, concurring in the result in *Brighton*, concluded that the entire property was the facility because § 9601(9)(B) defined a "landfill" in its entirety as constituting a "facility" and this court did not need to decide the bounds of the contamination under § 9601(9)(B) to designate the entire property as the facility. *Id.* at 323 (Moore, J. concurring in result). Thus, in *Brighton* this court reasoned that land which was used overall as a dumping site – thus, the land was widely contaminated – and was not geographically distinct could not be divided into reasonable or natural separate facilities. *See id.* at 313 (Judge Boggs's reasoning on defining the scope of facility), 323 (Judge Moore's concurrence relying on statutory language to define "facility").

Similarly, courts faced with widely contaminated land have refused to divide the land into separate facilities even when divisible into separate units. *See, e.g., Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 191 F.3d 409, 418-19 (4th Cir. 1999) (holding that widespread contamination scattered throughout the property prevented limiting the facility to the particular functional units simply because the property could be divided into those units); *Akzo Coatings, Inc. v. Aigner Corp.*, 960 F. Supp. 1354, 1358 (N.D. Ind. 1996) (rejecting the argument that because the "Site can be divided into five distinct geographic areas, each area is a distinct facility" and holding that hazardous waste had "otherwise come to be located in several locations at the Site"); *Northwestern Mutual Life Ins. Co. v. Atlantic Research Corp.*, 847 F. Supp.

## CONCURRING IN PART, DISSENTING IN PART

R. GUY COLE, JR., Circuit Judge, Concurring in Part and Dissenting in Part. I concur in the majority's decision in Parts II. A, B, D and E. Because I believe that Parcel 1, the parcel at issue, is geographically separable by a reasonable and natural division from the multiple non-contaminated parts, I find that Parcel 1 is the appropriate facility under 42 U.S.C. § 9601(9)(B). Therefore, I respectfully **DISSENT** from Part II. C of the majority's opinion.

As Judge Boggs noted in *United States v. Township of Brighton*,[1] "a facility should be defined at least in part by the bounds of the contamination." 153 F.3d 307, 313 (6th Cir. 1998). In *Brighton*, Judge Boggs reasoned that an area that cannot be reasonably or naturally divided into multiple parts, or functional units should be defined as a single facility, even if it contains parts that are non-contaminated. *See id*. at 313. Conversely, where property is reasonably and naturally divisible into contaminated and non-contaminated parts, a court can limit the facility to the contaminated portions of the property. In this case, the evidence shows that the three parcels have distinct legal descriptions and can be reasonably divided into multiple parts, separating the contaminated from the non-contaminated parts.

The majority emphasizes the fact that the parcels were never considered separate for any purpose other than land

---

[1] The *Brighton* court produced a divided opinion where Judge Boggs wrote for the court, Judge Moore concurred only in the result and Judge Dowd concurred in part and dissented in part. 153 F.3d 307 (6th Cir. 1998). In sum, the reasoning of the *Brighton* court differs according to the opinion of each of Judge, while the result is the product of the court. Accordingly, references to the *Brighton* opinion refer to the reasoning of the individual Judges where appropriate and not to the reasoning of the court.

approximately 450 were empty. The removal was completed on May 7, 1992. The estimated cost under control of the on-scene coordinator was $652,720. The district court ultimately determined that the costs and damages incurred by the government were $854,426.87. The Bohatys assert that a large underground storage tank was removed, although the on-scene coordinator's report does not indicate such activity.

The removal activities were confined to Parcel 1 of the property. The EPA inspected Parcels 2 and 3 visually and with a magnetometer for surface and subsurface drums, and found nothing to remove.

On May 5, 1995, just before the three-year statute of limitations expired, *see* 42 U.S.C. § 9613(g)(2)(A), the government brought an *in personam* action against the Glidden Company and an *in rem* action against the Bohatys' three parcels of land to recover the cost of the removal activity. The government executed a consent agreement with Glidden resolving the claims against Glidden for $60,000, leaving the Bohatys as the only defendants in this action. *See* 61 Fed. Reg. 29763. The government and the Bohatys both moved for summary judgment. On September 30, 1997, the district court granted the government's motion, denied the Bohatys' motion, and entered judgment "for the Plaintiff and against the Defendants." The Bohatys appealed to this court, but voluntarily dismissed their appeal without prejudice, apparently on the ground that the order entered by the district court was not a final judgment. The government, unopposed by the Bohatys, then moved the district court to modify its order and judgment entry. On January 26, 1998, the district court granted the motion and entered both an order modifying its previous judgment and order and a concurrent order of sale. Enforcement of the orders is stayed pending this appeal.

In related proceedings, on February 13, 1996, the EPA issued a *de minimis* order on consent addressing the potential liability of nine parties with regard to the Bohaty property. 61 Fed. Reg. 5550. Ashland Chemical Company, Dow Chemical Company, General Motors Corporation, Quaker Oats

Company, State Chemical Manufacturing Company, Inc., Synthetic Products Company, Uniroyal Chemical Company, Inc., and Upjohn Company were each assessed $1,050 in satisfaction of past and future claims connected with the Bohaty site. *Ibid.*

## II

### A.  The Structure of the CERCLA Defenses

The basic liability structure under CERCLA is set forth at 42 U.S.C. § 9607(a):

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
(1) the owner and operator of a . . . facility, [and]
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, . . . shall be liable for—
(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
. . . .

*Ibid.*  The CERCLA defenses are:

(b) Defenses
There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
. . . .
(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . , if the defendant establishes by a preponderance of the evidence that (a) he exercised due

―――――――――――――――

### CONCURRENCE

―――――――――――――――

NATHANIEL R. JONES, Circuit Judge, concurring. While I agree with the majority that the district court's construction of "disposal" for the purposes of 42 U.S.C. § 9601(35)(A) is overly expansive, the majority's interpretation is too narrow. The majority limits "disposal" to "spills occurring by human intervention." *Ante* at ___. This language seemingly restricts "disposal" to occasions where property owners release toxic substances themselves, or actively participate in exacerbating existing spills. The result is to potentially provide unjustified cover for spectator polluters, who are aware of past and ongoing toxic releases, yet do nothing to remedy them. Accordingly, I construe "disposal" under § 9601(35)(A) to encompass spills produced by human agency, including those precipitated by willful neglect. This construction conveys the "active" component of "disposal," yet still provides room for actions that are not affirmatively interventionist, but sufficiently assertive to fall outside the bounds of the CERCLA defense regime. I concur in the court's judgment and in all other aspects of Judge Boggs' opinion.

government's actions. The Bohatys have not presented evidence that filing the lawsuit influenced the RJO's decision; in addition, the lawsuit itself may be construed as part of the process afforded to the Bohatys. The district court is correct. The Bohatys received sufficient due process.

## III

The Bohatys have raised a genuine issue of material fact as to each element of the CERCLA "innocent landowner" defense, and are therefore entitled to have that defense survive summary judgment. They have not, however, raised a genuine issue of material fact as to whether any lien that may be proper covers Parcels 2 and 3, the district court's finding on the amount of costs that are recoverable if liability is established, or the due process claim.

For the foregoing reasons, the judgment of the district court with respect to the innocent landowner defense is REVERSED and the case is REMANDED to the district court for further proceedings consistent with this opinion. The judgment of the district court is AFFIRMED in all other respects.

care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

42 U.S.C. § 9607(b). The CERCLA definitions state:

(35)(A) The term "contractual relationship", for the purpose of section 9607(b)(3) of this title, includes, but is not limited to, land contracts, deeds or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:

(i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.

. . . .

(iii) The defendant acquired the facility by inheritance or bequest.

In addition to establishing the foregoing, the defendant must establish that he has satisfied the requirements of section 9607(b)(3)(a) and (b) of this title.

(B) To establish that the defendant had no reason to know, as provided in clause (i) of subparagraph (A) of this paragraph, the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability. For purposes of the preceding sentence the court shall take into account any specialized knowledge or experience on the part of the defendant, the

relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection.

. . . .

(D) Nothing in this paragraph shall affect the liability under this chapter of a defendant who, by any act or omission, caused or contributed to the release or threatened release of a hazardous substance which is the subject of the action relating to the facility.

42 U.S.C. § 9601.

Based on these provisions, the framework for considering the Bohatys' liability is this:  The present owners of a "facility" are liable for the costs incurred in removing toxic substances from the facility, unless

(1) they can establish by a preponderance of the evidence that the "release" of the substances and the damages resulting from the release were caused *solely* by an act or omission of a third party who was neither
   (a) the present owners' employee nor
   (b) someone who was in a contractual relationship with the owners;
*and*
(2) the owners
   (a) exercised due care with respect to the substances, in light of all relevant facts and circumstances, and
   (b) took precautions against the foreseeable actions and omissions of third parties.

The statutory definitions state, non-exclusively, that the following contractual relationships  satisfy (1)(b) above and thus create liability for owners:  land contracts, deeds, or other instruments transferring title or possession, *unless*

Furthermore, there is no evidence in the record that removing the empty drums raised the costs significantly.  There is also no evidence in the record on appeal that an underground tank was removed.  Nor is there evidence that the empty drums would have been accepted by an ordinary landfill, or that such disposition would have been less costly than the actual disposition.  Accordingly, the decision of the district court as to the amount of the cleanup costs is  affirmed.

## E.  Due Process

Relying on *Reardon v. United States*, 947 F.2d 1509 (1st Cir. 1991), the Bohatys argue that the lien on their property violates their Fifth Amendment due process rights.  The district court agreed that the lien deprived the Bohatys of a significant property interest, but held that the Bohatys were afforded sufficient due process.  The district court was correct.

To determine what process is due, we consider  (1) the private interest that will be affected by the official action;  (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute safeguards;  and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.  *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The district court found that the risk of erroneous deprivation was minimal because the Bohatys were given both notice of the government's intent to perfect the lien and a hearing before the EPA Regional Judicial Officer ("RJO"). The Bohatys argue that due process was not satisfied because the RJO is an EPA employee and because the lawsuit now before this court was filed before the RJO issued her decision. The RJO was sufficiently institutionally isolated to satisfy due process, *see* 5 U.S.C. § 554(d); *Withrow v. Larkin*, 421 U.S. 35, 56 (1975), and the need to file this lawsuit before the statute of limitations expired constituted an exigent circumstance sufficient to excuse the timing of the

(e) The following removal actions are, as a general rule, appropriate in the types of situations shown; however, *this list is not exhaustive* and is not intended to prevent the lead agency from taking any other actions deemed necessary under CERCLA, CWA section 311, or other appropriate federal or state enforcement or response authorities, and the list does not create a duty on the lead agency to take action at any particular time:

. . . .

(7) Removal of drums, barrels, tanks, or other bulk containers that contain *or may contain* hazardous substances or pollutants or contaminants—where it will reduce the likelihood of spillage; leakage; exposure to humans, animals, or food chain; or fire or explosion;

40 C.F.R. § 300.415 (emphasis added).

The question for decision, then, is whether removing the empty drums is "not inconsistent with" the provisions of 40 C.F.R. § 300.415 set forth above. Absent evidence that there were sufficient residual materials on the drums to constitute a threat to the public health or welfare, removing the empty drums cannot be said to *advance* or *promote* the goals of the NCP. However, even if strict logical inconsistency is not what the NCP means,[3] Congress did not say that costs must advance or promote the NCP to be recoverable. The general tenor of the NCP is permissive—the lead agency may take any appropriate action, including those on a list that is expressly not exhaustive and that includes removal of drums that "may contain" hazardous substances. Arguably, drums that are known to be empty are not drums that "may contain" hazardous substances. However, the generally permissive nature of the NCP, together with the apparent reasonableness of removing the empty drums, should be decisive.

---

[3]If the NCP does mean strict logical inconsistency, then the EPA could charge landowners for building an expensive sculpture on the land (assuming the sculpture were not itself a threat to health or welfare). Presumably, this is absurd and compels a different interpretation of "inconsistent."

(i) the present owners acquired their interest in the real property on which the facility is located after the "disposal" or "placement" of the substances, and
(ii) the present owners
(A) did not know, and had no reason to know, after "all appropriate inquiry," of the substances, or
(B) acquired their interests by inheritance or bequest.

Thus, present owners who acquired their interests by inheritance or bequest can avoid liability without having undertaken "all appropriate inquiry" with respect to the "disposal" or "placement" by third parties of hazardous substances on the land before they acquired it. However, they must have exercised due care with respect to the substances, in light of all relevant facts and circumstances, and taken precautions against the foreseeable actions and omissions of third parties, while they have owned the land. Present owners who acquired their interests by land contracts, deeds, or other instruments transferring title or possession, and *not* by inheritance or bequest, must also have undertaken "all appropriate inquiry" when they acquired the property to avoid liability.

The 12/45 interest that Ethel Bohaty bought from the three other relatives was transferred by quit-claim deed, and was not an inheritance or bequest. On first consideration, it appears that for this interest to avoid liability, Ethel must show that she undertook "all appropriate inquiry" when she bought it. *But see infra* at 14-15. The remaining 33/45 interest can avoid liability if the Bohatys establish by a preponderance of the evidence that (1) the "disposal" or "placement" occurred before 1982, (2) the "release" of the substances and the damages resulting from the release were caused solely by an act or omission of a third party (i.e., that they did not "cause or contribute to" the release, and (3) they exercised due care with respect to the substances, in light of all relevant facts and circumstances, and took precautions against the foreseeable actions and omissions of third parties since they have owned the land.

The Bohatys concede that they are the owners of the property, and thus that they are potentially responsible parties under § 9607(a)(1); they dispute that they are potentially responsible parties under § 9607(a)(2), as the government argues, because they contend that no "disposal" of hazardous substance has occurred while they owned the property. The Bohatys also concede that a "release" of "hazardous substances" has occurred on the property, that at least one of the three parcels is a "facility," and that the government incurred removal costs. They dispute the amount of the removal costs claimed by the government.

The issues on appeal are (1) whether the district court erred when it decided that the Bohatys do not qualify for the "innocent landowner" defense of §§ 9607(b)(3) and 9601(35) set out above; (2) whether the district court erred when it decided that the two unaffected parcels are part of the "facility;" (3) whether the district court erred when it found that the costs of disposing of the empty barrels and the underground tank were properly part of the removal costs; and (4) whether the Bohatys were deprived of due process by the actions of the EPA and the district court.

## B.  The Innocent Landowner Defense

The Bohatys argue first that they qualify for the "innocent landowner" defense of §§ 9607(b)(3) and 9601(35). The district court held that

Defendants cannot assert such defenses because they cannot prove that (1) the release or threat of release of hazardous substances and the resulting damages were caused solely by an act or omission of a third party; (2) the third party's act or omission did not occur in connection with a contractual relationship with the Defendants; (3) they exercised due care with respect to the hazardous substance; and (4) they took precautions against the third party's foreseeable acts or omissions and the foreseeable consequences resulting therefrom.

constitutes a "reasonable or natural" division into multiple parts.

We hold that it does not. There is no evidence in the record that the parcels were, at any relevant time, considered separate for any purpose other than the land records. They were transferred on the same deed, and except for a small part of one parcel they were in the same undeveloped state. The merely formal division in the land records is not a "reasonable or natural" division under *Brighton*.

## D.  Which Removal Costs are Proper?

The Bohatys argue that the removal action incurred unnecessary costs, for which they should not be liable. In particular, they claim that (1) the EPA should not have removed the empty drums at all, because they posed no environmental hazard; (2) the EPA should not have removed the underground storage tank, because it posed no environmental hazard; (3) after the EPA consolidated the contents of the 550 waste-containing drums into 300 drums for disposal, it should not have disposed of the 250 additional empty drums, because they posed no environmental hazard; and (4) at a minimum, the 700 empty drums should have been disposed of in a standard landfill rather than sent to a hazardous-materials site (presumably, at greater cost).

CERCLA places liability on responsible parties for "all costs of removal or remedial action incurred by the United States . . . not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(2)(A). The national contingency plan ("NCP") provides that:

At any release . . . where the lead agency makes the determination . . . that there is a threat to public health or welfare of the United States or the environment, the lead agency may take *any appropriate removal action* to abate, prevent, minimize, stabilize, mitigate, or eliminate the release or the threat of release.

40 C.F.R. § 300.415 (b)(1) (emphasis added).

law to interpret CERCLA's lien provision is a tenuous proposition.

The government states that this court has decided the issue, relying on *Kelley v. DuPont de Nemours & Co.*, 17 F.3d 836, 843 (6th Cir. 1994) for the proposition that a remedial investigation and feasibility study constitutes a "removal action." Although *Kelley* does state that the term "removal action" should be construed broadly, the statute-of-limitations issue in that case does not illuminate the geographic issue in the case before us. Furthermore, the government's claim that "the investigation in *Kelley* . . . examined ten contiguous sites, only one of which actually contained hazardous waste," Brief for the United States at 45, is misleading. There is no indication that the ten "sites" were separate parcels—they were merely ten locations in one large landfill that the EPA identified as possible locations of hazardous materials. The *Kelley* panel simply did not consider the issue of the geographical extent of a "removal."

The distinctive feature of the case before this court is the fact that the three parcels have separate identities, notwithstanding that they were historically conveyed together. The hard question is whether this should make any difference.

> The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contamination. . . . However, an area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single 'facility,' even if it contains parts that are non-contaminated.

*United States v. Township of Brighton*, 153 F.3d 307, 313 (6th Cir. 1998) (citing *Clear Lake Properties v. Rockwell Int'l Corp.*, 959 F. Supp. 763, 767-68 (S.D. Tex. 1997)). In *Brighton*, we held that where "it appear[ed] that the entire property was operated together as a dump," the whole parcel was a "facility" even though only one corner was contaminated. *Ibid.* To apply the teaching of *Brighton*, we must decide whether the fact that the Bohaty property is composed of three cartographically-denominated parcels

Opinion, J.A. at 62. Each of the four holdings, if correct, is dispositive standing alone.

First, the district court held that hazardous substances were "released" by the Bohatys. CERCLA defines "release" as follows: "The term 'release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22). Therefore, to prevail in their assertion of the "innocent landowner" defense, the Bohatys must prove that all spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) was "caused solely by" the acts or omissions of third parties who were neither employees nor persons in a contractual relationship with the Bohatys.

The district court held that the release of hazardous substances was caused, in part, by the Bohatys' "failure to remove or stabilize the drums on their property." The district court evidently was not entirely clear about the elements of and defenses to CERCLA liability. Having concluded that the release was not *solely* caused by a third party, which would in fact be fatal to the "third party" defense, the court then confusingly stated that the Bohatys "can still attempt to assert the innocent purchaser defense by demonstrating that a third party's 'act or omission [causing the release of hazardous wastes at the Site] occur[red] in connection with a contractual relationship, existing directly or indirectly with' them." J.A. at 63 (brackets in original) (citing 42 U.S.C. § 9607(b)(3)).[2]

---

[2] Section 9601(35)(A) exempts certain, apparently contractual, relationships from the § 9607(b)(3) rule that present owners are liable if the release was caused by third parties with whom they have contractual ties (or, whom they employ).

The court decided that the answer to this question depends upon whether the "disposal" preceded the Bohatys' acquisition of the property and concluded that "disposal" was ongoing.  For its definition of "disposal," CERCLA refers to the Solid Waste Disposal Act, which states that "[t]he term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water."  42 U.S.C. § 6903(3).

The distinction between "disposal" and "release" is important to our resolution of the case before us.  Although early CERCLA decisions interpreted "disposal" to include passive movement of substances (i.e., with no human activity), two circuits have recently limited "disposal" to spills occurring by human intervention.  *See United States v. CDMG Realty Co.*, 96 F.3d 706 (3rd Cir. 1996); *ABB Indus. Sys., Inc. v. Prime Tech, Inc.*, 120 F.3d 351, 358 (2d Cir. 1997) (adopting the reasoning of *CDMG Realty*).  This interpretation of the statute is the better view for several reasons.  *See* Michael S. Caplan, "Escaping CERCLA Liability: The Interim Owner Passive Migration Defense Gains Circuit Recognition," 28 ENVTL. L. REP. 10121 (1998).  First, because "disposal" is defined primarily in terms of active words such as injection, deposit, and placing, the potentially passive words "spilling" and "leaking" should be interpreted actively; second, "release" must be broader than "disposal," because disposal is included within release, *see* 42 U.S.C. § 9601(22); and third, it makes sense of the statutory scheme as well as the words themselves to have "disposal" stand for activity that precedes the entry of a substance into the environment and "release" stand for the actual entry of substances into the environment.  On this more recent view, the Bohatys acquired the property after the "disposal."  The question is whether "release" continued after their acquisition.

In the absence of any evidence that there was human activity involved in whatever movement of hazardous substances occurred on the property since the Bohatys have owned it, we hold that the Bohatys have not "disposed" of hazardous substances on the property.  We also hold that the

(B) The time that the person referred to in paragraph (1) is provided (by certified or registered mail) written notice of potential liability.
Such lien shall continue until the liability for the costs (or a judgment against the person arising out of such liability) is satisfied or becomes unenforceable through operation of the statute of limitations provided in section 9613 of this title.

42 U.S.C. § 9607(*l*)(1).

The government argues that the three parcels were all "subject to or affected by" the removal.  EPA investigators observed Parcels 2 and 3 both visually and with a magnetometer to locate any drums that might have been deposited there.  The government presented evidence that the pond, upon which the investigators expended considerable energy, extends beyond Parcel 1 to Parcel 3.  Are these

such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or . . . such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release?

They may be, but that does not appear self-evident.

The record indicates that interests in the three parcels have been transferred together by the same instruments, rather than by separate instruments for each parcel, at least since 1982.  The district court looked to asset-forfeiture cases, and found support for the proposition that a "property" is "defined by the recorded instruments and documents that created the defendant's interest in the property."  *See United States v. Smith*, 966 F.2d 1045 (6th Cir. 1992) (citing *United States v. Santoro*, 866 F.2d 1538, 1543 (4th Cir 1989) and *United States v. Reynolds*, 856 F.2d 675, 677 (4th Cir 1988)).  As the district court acknowledged, looking to criminal forfeiture

## C.   What Constitutes the "Facility"?

The parties agree that no release nor threat of release occurred on Parcels 2 and 3. Therefore, the Bohatys argue, even if they are liable, a lien is appropriate only on Parcel 1.

(9) The term "facility" means . . . (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.
. . . .
(23) The terms "remove" or "removal" means [sic] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601.

All costs and damages for which a person is liable to the United States under subsection (a) of this section . . . shall constitute a lien in favor of the United States upon all real property and rights to such property which—
(A) belong to such person;  and
(B) are subject to or affected by a removal or remedial action.
. . . .
The lien imposed by this subsection shall arise at the later of the following:
(A) The time costs are first incurred by the United States with respect to a response action under this chapter.

Bohatys have raised genuine issues of material fact as to the three other crucial issues:  whether they (1) "released" hazardous substances on the land, (2) "exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances," and (3) "took precautions against foreseeable acts or omissions of [third parties] and the consequences that could foreseeably result from such acts or omissions."  These holdings resolve the appeal on the 33/45 interest obtained by inheritance by the present Bohaty owners.  We give our reasoning on each of the three in turn.

The only evidence presented by the government that the Bohatys "released" hazardous substances were several photographs showing what might be hazardous substances on the ground near rusted drums and the statements of inspectors to that effect.  No evidence was presented, for example, that at one time after the Bohatys acquired the land the piles near certain drums were one size and, later, that they were larger.  The government appears to be relying on the inference that because there were hazardous substances outside the drums, and because some of the drums were not empty, the leaking must have been ongoing.  Perhaps, with appropriate factual development, the government will be able to justify that inference at trial.  The government has not, however, advanced sufficient evidentiary support at this time to show the absence of a genuine issue of material fact.

The fact that the drums were present on the property and that the Bohatys knew about them, at least after the first OEPA visit in 1987, calls into question whether the Bohatys "exercised due care with respect to the hazardous substance[s] concerned, taking into consideration the characteristics of such hazardous substance[s], in light of all relevant facts and circumstances."  However, the Bohatys presented evidence that after both the 1987 and the 1989 inspections they asked OEPA to advise them if anything needed to be done, that the tests performed in 1987 by OEPA were negative, and that OEPA never told them that action was necessary.  The

Bohatys have raised a genuine issue of material fact as to whether they exercised the required degree of care.

The government has shown that the property was accessible to third parties, which may indicate that the Bohatys did not take "precautions against foreseeable acts or omissions of [third parties] and the consequences that could foreseeably result from such acts or omissions." However, there is no evidence in the record that any third parties ever compromised the integrity of the drums or otherwise caused the release of their contents. Perhaps the precautions taken by the Bohatys were adequate under the circumstances. Again, the government has not shown the absence of a genuine issue of material fact.

Therefore, as to the 33/45 inherited interest, the Bohatys have shown a genuine issue of material fact as to each element of the CERCLA innocent landowner defense and are entitled to proceed to trial.

Finally, with respect to the 12/45 interest sold to Ethel by other Bohaty heirs, we hold that Ethel has raised a genuine issue of material fact as to whether she "undert[ook], at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability" with respect to the interest she purchased from her relatives.

There is no evidence that Ethel conducted a particular inquiry when she bought the interests.

However, the particular inquiry that is necessary under the statutory definition is clearly dependent on the totality of the circumstances. In particular, the requirement is that "the defendant . . . has no reason to know that any hazardous substance . . . was disposed of . . . at the facility." 42 U.S.C. § 9601(35)(A)(i). Subsection (35)(B) amplifies this definition stating that "the defendant must have undertaken, at the time of acquisition, all *appropriate* inquiry into the previous ownership and uses of the property consistent with good

commercial or *customary* practice in an effort to minimize liability." The definition also emphasizes the particularity of the inquiry by noting that "the court *shall* take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection."

These paragraphs and definitions obviously contemplate primarily a willful acquisition or purchase of the property for a particular commercial or personal purpose. They also, though not explicitly, seem to contemplate the acquisition of all of the interest in a "facility" at one time. This case, however, is of quite a different sort. Ethel and the other Bohaty defendants had inherited undivided interests constituting a large majority of the ownership of the parcel. Three other heirs had inherited very small portions, less than two years before the other fractional interests were bequeathed to Ethel. A year later, while the estate of Ethel's husband was still in probate, the three other relatives sold their fractional interest to Ethel. Under these circumstances, where one part-owner by inheritance acquires an interest from another part-owner by inheritance, apparently merely to consolidate the inherited ownership interest, the level of "appropriate inquiry" is a very fact-specific question. We see no evidence in the record of what is "customary practice" in connection with such family transactions. There is also no evidence of the specific purchase price and the "value of the property if uncontaminated" or other factors mentioned in the definition. Under these circumstance we hold simply that, at this time, we cannot state as a matter of law that Ethel's actions were not "appropriate inquiry" under the circumstances at the time of the sale of the other fractional interests. On remand, the burden will rest on Ethel, assuming all the other requisites of the defense with respect to her inherited interests are met, to also show that she met the requirement of "appropriate inquiry."