**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2665-15T1

IN THE MATTER OF SPILL
FUND LIEN, DJ NO. 129570-02;
954 ROUTE 202, BLOCK 44,
LOT 30, BRANCHBURG
TOWNSHIP, SOMERSET
COUNTY.

_____

Argued November 14, 2018 – Decided August 13, 2019

Before Judges Ostrer, Currier and Mayer.

On appeal from the New Jersey Department of Environmental Protection, Spill Compensation Fund.

Stuart J. Lieberman argued the cause for appellant Branch 2002, LLC (Lieberman & Blecher, PC, attorneys; Stuart J. Lieberman, of counsel and on the brief; Jordan M. Asch, on the briefs).

Thomas P. Lihan, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Matthew D. Orsini, Deputy Attorney General, on the briefs).

PER CURIAM

Branch 2002 LLC appeals from a final agency decision of the Spill Compensation Fund (Fund). The Fund rejected Branch's contest of a lien filed against its property and revenues to recover pollution remediation costs that the Fund expended. Branch challenges the decision on three grounds. First, citing N.J.S.A. 58:10-23.11f(f), it contends the Spill Compensation and Control Act (Spill Act) authorizes pre-judgment liens only against the property or revenues of a "discharger," and the Fund did not contend Branch was a discharger; rather, it contended Branch was a person in any way responsible for hazardous substances. Second, Branch contends the lien contest procedures denied it due process, and the Fund was obliged to establish the reasonableness of its cleanup and removal costs before filing a lien. Third, Branch argues that the Fund was barred from filing the lien because the Department of Environmental Protection (Department) knew that a third party agreed to indemnify Branch for the Fund's claims. Having reviewed Branch's arguments in light of the record and applicable principles of law, we affirm.

I.

The case involves the discharge of various hazardous substances at a gas station in Branchburg. In 1988, the owner, Daniel Shoplock, discovered the discharge while removing three underground storage tanks, and notified the

Department. Following monitoring, sampling and testing, the Department in 1991 ordered Shoplock to conduct a remedial investigation and remove or treat the contaminated soil. Shoplock's consultant conducted some analysis of the site, but the Department, not Shoplock, performed remediation with Fund resources. At one point, the Department had to seek judicial relief to access the property to remediate it.

In the meantime, control of the property changed hands. In 1993, Shoplock entered into a lease-purchase agreement with John & Jerry, Inc., which thereafter leased and operated the gas station (and, for a time, entered into a sublease with an automobile repairer). There is some evidence in the record that discharges continued after John & Jerry took over, but that point is disputed. On April 23, 2004, John & Jerry purchased the property from Shoplock for $448,000. Branch alleges that Shoplock and its insurer agreed to indemnify John & Jerry for any liability arising out of Shoplock's discharge.[1] Within a week of acquiring title, John & Jerry transferred the property to Branch for token

---

[1] The record includes a copy of an indemnification agreement, but it is not fully executed.

A-2665-15T1

or no consideration.[2]  Peter Singh was John & Jerry's sole shareholder, and, apparently, Branch's sole member.  Branch admits it is the successor to John & Jerry and continued to operate the gas station.

In May 2002, while Shoplock was still the title owner, the Fund Administrator filed the Fund's first notice of lien against the property "for all expenditures made as of April 15, 2002, from the Fund in connection with the discharge of hazardous substances at or from" the property.  The notice stated that the expenditures totaled $48,601, but the "lien may be amended from time to time as additional expenditures and/or commitments are incurred by the Fund in connection with the discharge of hazardous substances at or from" the property.  The notice characterized Shoplock as "the discharger," and requested the Superior Court Clerk to enter Shoplock's name and address in the record of docketed judgments and the amount of the debt.  The notice did not mention John & Jerry or Singh.

Remediation continued at the site in the years that followed.  In March 2015, almost thirteen years after filing the initial lien, the Department wrote to Branch, John & Jerry, and Shoplock, advising them that as of March 16, 2015,

---

[2]  The deed is not in the record.  The agency contends the property was transferred for $1.  However, hearsay documents indicate the property was transferred for zero dollars.

the Fund's expenditures at the site reached $1,876,689.77. The Department sought reimbursement and advised that if the costs were not paid within thirty days, the Department would amend its prior lien on the Branchburg property and on Branch's other real or personal property. The letter also advised Branch that it was responsible for further remediation of the site, including hiring its own licensed site remediation professional; and its failure to remediate "may cause the Department to incur additional cleanup and removal costs at the site, which would increase [Branch's] debt to the State and the Spill Fund."

On June 5, 2015, the Administrator filed its notice of amended first priority lien with the Superior Court. This time, the notice asked the clerk to enter "the names and addresses of the responsible parties" including Shoplock, as "Discharger"; John & Jerry as "A Person in Any Way Responsible"; and Branch as "Owner(s) and A Person in Any Way Responsible".

Ten days later, the Department notified Branch in writing that it had filed the amended lien, and the lien against the Branchburg property had first priority over all other claims or liens that may have been filed against the property; but the lien also attached – without asserting first priority status – to Branch's revenues and other real and personal property. The Department advised Branch it could contest the lien if it believed "the Department did not have a reasonable

basis to file the lien." It also advised Branch that it could obtain the "Lien Filing Record," which contained documents related to the agency's decision to file the lien.

The lien contest procedure – which we discuss at greater length below – consists of written submissions to a "neutral agency officer," who then submits a recommended decision to the Administrator. Spill Act Lien Administrative Guidance (Feb. 4, 2016), https://www.nj.gov/dep/srp/guidance/srra/spill_act_lien_guidance.pdf. In opposing the lien, Branch contended it was not a "discharger" as the Spill Act's plain language required; the lien amount was grossly inflated – although Branch did not identify which costs were excessive or inflated; and the agency acted in bad faith in pursuing Branch while aware of Shoplock's and its insurer's agreement to indemnify Branch.

In response, the Department, through the Attorney General, contended that Branch purchased the property subject to the initial lien. As the lien was amendable and not discharged, the increased lien properly encumbered the property. The Department addressed Branch's three points. The Department argued that even if Branch were not a "discharger" – a point the Department did not concede – it was a person "in any way responsible" and therefore subject to a lien. The Department asserted that Branch's objection to the Fund's costs

should be heard in a cost recovery action, because in a lien contest, "it is enough that the Department can prove it actually incurred the costs." Also, the Department argued that Branch's indemnification agreement did not bind or restrict the Department. In reply, Branch reiterated its objections, and highlighted that the lien notice did not call Branch a discharger.

In a written recommendation, the neutral agency officer reviewed the evidence of the discharge, the Department's response, and the property's ownership. The officer concluded that "substantial credible evidence in the Record support[ed] the Administrator's filing of the Amended First Priority Lien." She stated that the evidence established that the property was polluted, and Branch was a responsible party by virtue of its knowing purchase of the polluted property. The Department remediated the property and adequately notified Branch of the costs it incurred. Branch's claim that the costs were excessive was "not an issue for th[e] lien contest," but an appropriate defense in any cost recovery action. The officer found that the indemnification agreement did not bind the agency. Finally, the officer declined to address Branch's contention that the Spill Act only authorized liens against property that a discharger owned, concluding it was a "legal issue beyond the scope" of her review.

The Fund's assistant director, ostensibly acting on behalf of the Administrator, adopted the officer's recommendation in a Lien Contest Final Decision. The assistant director noted that his decision was "narrowly limited to the issue of whether or not the Spill Fund had a reasonable basis" to file the lien, and did not preclude any defenses Branch may have in subsequent cost recovery or enforcement proceedings.

This appeal followed.

## II.

We first consider Branch's point that the lien was unreasonable because the Spill Act authorizes liens only on the property and revenues of a "discharger," and no one else. The lien notice expressly characterized Branch as a "person in any way responsible," not as a "discharger." We reject Branch's argument because the Supreme Court has held that a "discharger" <u>includes</u> a person in "any way responsible." <u>In re § Petroleum Corp.</u>, 110 N.J. 69, 73 (1988).

The lien provision, N.J.S.A. 58:10-23.11f(f), instructs the Administrator to file a pre-judgment lien with the Superior Court Clerk against property and revenues of a "discharger" for the amounts the State committed for cleanup and

removal.    The first unnumbered paragraph of subsection (f) defines a

discharger's debt as a lien, stating:

> Any expenditures of cleanup and removal costs and
> related costs made by the State pursuant to this act shall
> constitute, in each instance, a debt of the discharger to
> the fund.  The debt shall constitute a lien on all property
> owned by the discharger when a notice of lien,
> incorporating a description of the property of the
> discharger subject to the cleanup and removal and an
> identification of the amount of cleanup, removal and
> related costs expended by the State, is duly filed with
> the clerk of the Superior Court. . . .  [T]he lien, to the
> amount committed by the State for cleanup and
> removal, shall attach to the revenues and all real and
> personal property of the discharger, whether or not the
> discharger is insolvent.

The second paragraph of subsection (f) addresses the priority of the lien.

As to the polluted property (other than certain residential properties), the lien

supersedes all other claims or liens, even if filed before the Spill Act lien;[3] as to

other property, the lien takes its place in line.[4]

---

[3] As the lien supersedes previously-filed liens, it is known as a "superlien," see 13C New Jersey Practice, Real Estate Law and Practice § 46:177 (Matthew S. Slowinsky & Henry C. Walentowicz) (2014), or a lien with "superpriority," 2 Environmental Law in Real Estate & Business Transactions § 13.04 (2019).

[4] As originally enacted, the lien had such superpriority status against all the discharger's property.  L. 1979, c. 346, § 4.  Concerned that the provision negatively affected the availability of mortgage funds, the Legislature in 1985 amended the statute to limit the superlien to the polluted property (except for

The Spill Act does not define "discharger," but it defines "discharge" as "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State" or out-of-state waters when it causes damage to in-state "lands, waters or natural resources." N.J.S.A. 58:10-23.11b.

The Legislature first authorized liens against a discharger's property in a 1979 amendment to the Spill Act, which was enacted three years earlier. L. 1979, c. 346, § 4, then codified as N.J.S.A. 58:10-23.11f(e), amending L. 1976, c. 141, § 7. In the same legislation, the Legislature amended the strict liability section of the Spill Act, which initially applied only to "any person who has discharged a hazardous substance." Compare L. 1976, c. 141, § 8(c) with L. 1979, c. 346, § 5, codified at N.J.S.A. 58:10-23.11g(c). Under the amendment, strict liability also applied to "any person who . . . is in any way responsible for any hazardous substance." L. 1979, c. 346, § 5. The Supreme Court recognized this expansion of liability. "With its 1979 amendment . . . [n]o longer was liability limited to those who had actively discharged hazardous substances.

---

certain residential property). L. 1985, c. 11, § 1; see also Sponsor's Statement to Senate Bill 1423 (Feb. 27, 1984).

Rather, one was strictly liable if one was 'in any way responsible for any hazardous substance which the [Department] has removed or is removing pursuant to . . . this act." Marsh v. N.J. Dep't of Envtl. Prot., 152 N.J. 137, 146 (1997) (quoting L. 1979, c. 346, § 8c) (alterations in original). See also Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 494 (1983) (discussing 1979 amendment).

One may plausibly argue that if the Legislature intended liens to attach to property or revenues of a person "in any way responsible", it could have said so, as it did expressly in the section on strict liability. Branch highlights a subsequent amendment to subsection (a) of N.J.S.A. 58:10-23.11f. It authorized a "discharger or person" who has performed a cleanup or removal to seek contribution from "all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance." L. 1991, c. 372, § 1, codified at N.J.S.A. 58:10-23.11f(a)(2)(a). Relying on the statutory construction canon expressio unius est exclusio alterius – the expression of one thing implies the exclusion of others – Branch argues that, in using only "discharger" in subsection (f), in contrast to subsection (a)(2), the Legislature intended to exclude persons "in any way responsible" from the lien provision.

However, we do not write on a clean slate. The Supreme Court defined "discharger" as used in N.J.S.A. 58:10-23.11f to include a person "in any way responsible." In re Kimber Petroleum, 110 N.J. at 73. The Court quoted and reconciled the subsection that authorized treble damages against "dischargers" only, N.J.S.A. 58:10-23.11f(a), and the strict liability provision in N.J.S.A. 58:10-23.11g(c) that imposed strict liability on a person "in any way responsible for any hazardous substance which the department has removed or is removing" as well as "any person who has discharged a hazardous substance." In re Kimber Petroleum, 110 N.J. at 73. Rather than hold that the former applied to a narrower universe of persons, the Court merged the concepts: "Thus under these provisions a 'discharger' is one who has 'discharged a hazardous substance or is in any way responsible' for such a discharge." Ibid.

We recognize that the Supreme Court was interpreting "discharger" as used in subsection (a) pertaining to treble damages, as opposed to subsection (f) pertaining to liens. However, we discern no compelling basis to assign a different meaning to the same word in the same section. See Feuer v. Merck & Co., 455 N.J. Super. 69, 79 (App. Div. 2018) (stating that absent a "clear indication to the contrary," the court presumes that a phrase used in two subsections means the same), aff'd o.b., 238 N.J. 27 (2019).

12

Also, one may argue that the Court's definition of "discharger" was not essential to its holding in In re Kimber Petroleum. The case pertained to the agency's power to order installation of a replacement water supply, and a discharger's due process right to contest the directive without subjecting itself to treble damages. 110 N.J. at 73-87. However, we are bound by the Supreme Court's considered dictum. State v. Dabas, 215 N.J. 114, 136-37 (2013) (stating that "appellate and trial courts consider themselves bound by this Court's pronouncements, whether classified as dicta or not").[5]

Branch does not dispute that it is a person "in any way responsible." Therefore, we need not determine whether Branch "discharged" hazardous substances, as contemplated by the definition of "discharge" in N.J.S.A. 58:10-23.11b, in order to decide whether it was subject to the lien as a "discharger" under N.J.S.A. 58:10-23.11f(f). Consistent with the Supreme Court's definition of

---

[5] We note that the Department, in its briefing before us, did not rely on the definition of "discharger" found in In re Kimber Petroleum. Instead, the Department argued that, liberally construing the lien provision, consistent with the Spill Act's command, see N.J.S.A. 58:10-23.11x, we should find, essentially, that where there is liability – as authorized by the strict liability provision – there should be lienability. Otherwise, the efficacy of the cost-recovery scheme would be impaired. The Department's argument lends further support to the Supreme Court's explicit pronouncement.

A-2665-15T1

"discharger" in In re Kimber Petroleum, the Department could file a lien against Branch as a person "in any way responsible."

## III.

We reject Branch's argument that the Fund denied its due process right to contest the costs and reasonable basis for the lien.

A due process analysis is triggered upon a finding that the statute affects a significant property interest. See Reardon v. United States, 947 F.2d 1509, 1517 (1st Cir. 1991) (en banc). We accept the premise that the Fund's prejudgment lien on a discharger's property and revenues triggers a right to adequate notice and an opportunity to be heard. See Connecticut v. Doehr, 501 U.S. 1, 12 (1991) (stating that "state procedures for creating and enforcing attachments, as with liens, are subject to the strictures of due process"); United States v. 150 Acres of Land, 204 F.3d 698, 710 (6th Cir. 2000) (applying due process analysis to a lien filed pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA)); Reardon, 947 F.2d at 1518 (stating that a CERCLA lien implicates due process concerns); Sherwood Court v. Borough of S. River, 294 N.J. Super. 472, 482 (App. Div. 1996) (applying due process analysis to a lien used to secure payment of unpaid utility

charges). A CERCLA lien "cloud[s] title, [and] limit[s] alienability." Reardon, 947 F.2d at 1518. The same is true of a Spill Act lien.

The question is what process is due. The answer is found by applying the three factors in Mathews v. Eldridge, 424 U.S. 319, 335 (1976): (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Other courts, applying the Mathews factors, have held that an environmental lien affects a significant property interest worthy of due process protection, and have reached varying conclusions as to whether the procedure afforded satisfied due process. See 150 Acres of Land, 204 F.3d at 710-11 (finding a CERCLA lien deprived property owners of "a significant property interest" but the hearing before a regional judicial officer "afforded sufficient due process"); Reardon, 947 F.2d at 1518-19 (finding a CERCLA lien affected significant private interests, especially because the lien lacked a definite sum, and procedures then in place, which afforded "no pre-deprivation proceedings

15

at all," were inadequate to protect due process); <u>Van Horn v. Dep't of Toxic Substances Control</u>, 180 Cal. Rptr. 3d 416, 423 (Ct. App. 2014) (finding that a lien under California's counterpart to CERCLA affected a significant private interest (citing <u>Reardon</u>), and its procedures were inadequate to protect due process).

Applying the <u>Mathews</u> factors to the Department's procedure as applied to the case before us, we discern no constitutional violation. Turning to the first factor, we agree with the cited federal and California courts that the private interest affected by the lien may be significant. <u>See also</u> <u>Doehr</u>, 501 U.S. at 12 (holding that an interest may be significant notwithstanding that the lien's "effects do not amount to a complete, physical or permanent deprivation of real property"). A lien of any amount encumbers a responsible party's property and its revenue. The precise amount of the lien may heighten the impact on property rights. If it far exceeds the value of the property subject to the lien, then the lien may render that property unmarketable. On the other hand, if the amount is minimal, compared to the overall value of the property, the lien could be a manageable impediment to marketing the property. But, given its superpriority status regarding the polluted property, a lien of any amount may constitute a default under a first mortgage lien.

Here, Branch has not asserted that the lien has interfered with actual efforts to sell or mortgage the property. Since John & Jerry transferred the property for, at most, nominal consideration, we presume there is no mortgagee whom the lien has rendered insecure, and Branch has not identified one. Furthermore, Branch has not alleged that it owns any other real property affected by the lien, or that the lien has affected its revenues. Thus, although the mere presence of the lien affects Branch's private interests, those interests are not as significant as they might have been under other circumstances.

In order to analyze the second Mathews factor, we must review the process provided. The Department provides two notices – as it did here, in March and June 2015 – one at least thirty days before filing the lien and one within thirty days after. Spill Act Lien Administrative Guidance § 4-5. The first notifies the property owner of the amount of the lien, and provides a summary and invoice detailing the Department's cleanup costs. The second notice informs the recipient of the lien filing, and advises the recipient that it may contest the lien and obtain the lien filing record. Id. at § 5. The recipient has sixty days thereafter to contest the lien, by providing "[a] statement of the specific reasons that the property owner believes, based upon the factual information in the lien filing record, that the Department did not have a reasonable basis for filing the

Spill Act lien." Id. at § 7. Within thirty days, the Department may respond with a written submission to a neutral agency officer who is unfamiliar with the site and the property owner. Ibid. The challenger then has ten days to reply. Ibid.

Once the lien filing record is closed, the neutral agency officer "will then review the lien filing record and make a recommendation to the Administrator [of the Fund] whether the Department had a reasonable basis to file a Spill Act lien against the property based upon substantial credible evidence in the lien filing record." Id. at § 8. Notably, the guidance document does not define what constitutes such a "reasonable basis" for filing a lien. The Administrator then reviews and adopts, rejects, or modifies the officer's recommendation in a final agency action. Id. at § 9.

The Department adhered to those procedures here. It gave Branch advance notice of the lien filing. It provided Branch access to the detailed records of the Fund's expenditures. Branch also knew a lien encumbered the property when Branch bought it; and surely, Branch knew that remediation was ongoing. Although the neutral hearing officer did not expressly define a "reasonable basis" for the lien, she found that "substantial credible evidence in the Record support[ed]" the filing, based on the evidence of the hazardous

substance discharge, the costs incurred, and the property's ownership, including Branch's knowing purchase of contaminated property.

The risk that the procedure would produce an erroneous result takes two forms. The risk of error may arise from the nature of the procedure itself. Whether it occurs pre- or post-deprivation; and whether it allows discovery, live testimony, the right to cross-examine, and other procedural rights may limit the procedure's truth-finding ability. The risk of error also may arise if certain issues are placed outside the scope of the procedure, regardless of its limitations.

Regarding the nature of the procedure, the absence of a hearing before the lien is in place contributes to the risk of an uncorrected error. However, the Department offers a prompt post-filing review by a neutral agency officer. By contrast, under the procedure reviewed in Reardon, 947 F.2d at 1519, the first hearing a property owner would get to review a lien would occur "at the enforcement proceeding, or cost recovery action, . . . [which] may be brought several years after notice of the lien is filed."

Furthermore, if essential facts are disclosed in business records and other reliable documentary evidence, then the risk of error in a purely paper-based review may be minimal. We perceive such minimal risk here regarding the fact of the discharge; Branch's notice of it; Branch's ownership; the clean-up and

19

removal actions taken; and the costs incurred (putting aside whether they were justified or excessive). Those facts, upon which the lien filing is predicated, are all verifiable by a review of public records, and the Department's file. See Reardon, 947 F.2d at 1519 (stating the "[o]wnership of land, and the physical presence of hazardous substances on land, are matters that are subject to relatively simple resolution"); see also Doehr, 501 U.S. at 14 (contrasting the risk of error in a pre-judgment lien under Connecticut law against a defendant's property based on a personal injury claim, and "'ordinarily uncomplicated matters that lend themselves to documentary proof,'" such as "the existence of a debt or delinquent payments" (quoting Mitchell v. W.T. Grant Co., 416 U.S. 600, 609 (1974))); Sherwood, 294 N.J. Super. at 483 (distinguishing the risk of error of the lien reviewed in Doehr, and the New Jersey lien for unpaid utility bills). Granting a party like Branch the ability to engage in discovery, and to call and cross-examine witnesses, would not significantly enhance the procedure's capacity to accurately find those facts.

However, completely excluding certain issues from the procedure leaves their determination untested, and creates a risk of error. The Department excludes from the lien contest procedure the issue of the excessiveness of the Fund's costs, although a lienee apparently may challenge the amount of the lien

on other grounds, for example, that the Department miscalculated the amounts expended, or misallocated costs from one cleanup to another. According to the neutral agency officer's proposed decision, which the Fund adopted, the reasonableness of the costs is left for a cost recovery action. In the meantime, barring an excessiveness determination may result in a larger-than-needed burden on property rights, if the actual debt is later found to be less in a cost recovery action.

Yet, expanding the scope of the lien contest procedure to permit review of an excessiveness claim may significantly burden the government's interest in swiftly cleaning up and removing hazardous substances when those who have discharged them, or are in any way responsible for them, have failed to do so. In contrast to the existence of liability, the issue of excessiveness is not likely to be susceptible to resolution on a documentary record alone. Reardon, 947 F.2d at 1519 (stating that the amount, as opposed to the existence of liability, is a "highly factual" issue). Litigating such a disputed claim in a plenary hearing, while cleanup and removal actions are ongoing, may divert agency resources and personnel and delay remediation efforts.

Postponing resolution of the amount of a lienee's debt until a cost recovery action is not enough to render the lien contest procedure unconstitutional. The

Supreme Court has held that, in the tax context, "[m]ere postponement of judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate." Phillips v. Comm'r, 283 U.S. 589, 596 (1931); N.Y., Susquehanna & W. R.R. Co. v. Vermeulen, 44 N.J. 491, 501 (1965) ("[D]ue process does not forbid compulsion to pay taxes now and litigate later.").

We conclude that the lien contest procedure afforded Branch in this case was sufficient to protect its right to due process. In sum, the risk of erroneous deprivation of a significant private interest is minimal, except as may pertain to the amount of the lien. Expanding the scope of the lien contest to include resolution of that issue would impose a significant burden on the agency. Branch will have an opportunity to address its excessiveness claim in a cost recovery action.

IV.

We comment briefly on Branch's argument that the Department was barred from filing the lien because of Branch's alleged indemnification agreement with Shoplock and its insurer. The Spill Act authorizes the Department to seek recovery of cleanup costs directly from an insurer. N.J.S.A. 58:10-23.11s. However, that authority does not compel the Department to

22

refrain from enforcement against Branch, let alone bar the filing of a pre-judgment lien against the property of a responsible party. Liability is joint and several. N.J.S.A. 58:10-23.11g(c)(1). Therefore, it may pursue its remedies against responsible parties at its discretion. See Nester v. O'Donnell, 301 N.J. Super. 198, 212 (App Div. 1997).

In sum, the final agency decision of the Spill Fund is affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION