227 F.3d 1196 (9th Cir. 2000)
 CARSON HARBOR VILLAGE, LTD., a limited partnership dba Carson Harbor Village Mobilhome Park, Plaintiff-counter-defendant-Appellant,
v.
UNOCAL CORPORATION, a Delaware Corp., Defendant-cross-defendant,
and
CITY OF CARSON, Defendant-cross-defendant-cross-claimant-Appellee.
 Nos. 98-55056, 98-55107, 98-55210, 98-55213, 98-55215, 98-55422
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted September 13, 1999
Filed September 14, 2000
 
 [Copyrighted Material Omitted]
 Frank Gooch, III; Chris M. Amantea, Santa Monica, California, for the plaintiff-appellant.
 Lisa Bond, Los Angeles, California, for defendant-appelleeCity of Carson.
 Thomas C. Sites, Los Angeles, California, for defendantappellee City of Compton (did not argue).
 Charles Jordan, Los Angeles, California, for defendantappellee Unocal.
 Walter L. Lipsman, Douglas J. Collodel, Richard H. Nakamura, Los Angeles, California, for defendant-appellee Carson Harbor Village.
 Kristin E.D. Dunn, Long Beach, California, for defendantappellee County of L.A. (did not argue).
 Appeal from the United States District Court for the Central District of California. Kim McLane Wardlaw, District Judge. D.C. No. CV-96-03281-KMW
 Before: Betty B. Fletcher and Harry Pregerson, Circuit Judges, and Charles R. Weiner, District Judge.[1]
 B. FLETCHER, Circuit Judge:
 
 
 1
 The current owner of land contaminated by storm water runoff and oil production filed this action against prior owners and operators of the property, as well as certain local government entities, to recover cleanup costs under, inter alia, the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C.S 9607(a), and California common law. The district court dismissed the case on cross motions for summary judgment, reasoning that plaintiff failed to meet its burden on at least one of the CERCLA elements, and that its common law claims were without merit.[2] We have jurisdiction over plaintiff's appeal pursuant to 18 U.S.C. 1291, and we reverse in part, affirm in part, and remand for further proceedings.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 Carson Harbor Village, Ltd. ("Carson Harbor") owns and operates a mobile home park on 70 acres of land in the City of Carson, California. Carson Harbor Village Mobile Home Park, a general partnership run by Richard G. Braley and Walker Smith, Jr. (collectively, the "Partnership Defendants"), owned the property from 1977 to 1983 and also operated a mobile home park there. Between 1945 and 1983, Unocal Corporation ("Unocal") held a leasehold interest in the property and used it for petroleum production. Specifically, Unocal operated a number of oil wells, pipelines, above-ground storage tanks, and production facilities.[3]
 
 
 3
 An undeveloped open flow wetlands area covers approximately 17 acres of the property. The wetlands form a natural drainage course that bisects the trailer park from the northeast to the southwest. At the northeast edge of the wetlands, storm water controlled by the City of Carson, the City of Compton and the County of Los Angeles (collectively, the "Government Defendants"), feeds into the wetlands through two storm drains. The drainage area immediately upstream from plaintiff's property includes California Highway 91, operated by the California Department of Transportation ("Caltrans"), as well as mixed use industrial and residential properties. Runoff from approximately three miles of the freeway drains to the wetlands.
 
 
 4
 In the course of seeking refinancing for the property in 1993, plaintiff's lender commissioned an environmental assessment which revealed slag and tar like material in the wetlands. Subsequent investigation disclosed (1) that the material had been on the property for several decades prior to its development as a mobile home park; (2) that the material was some form of waste or by-product from petroleum production; (3) that the material was approximately four feet thick and covered roughly a 30 by 160 foot area in the wetlands; (4) the material and surrounding soils contained elevated levels of petroleum hydrocarbons (measured in terms of total petroleum hydrocarbons or "TPH") and lead)[4]; and (5) soil samples upgradient of the material also contained elevated levels of TPH and lead.[5]
 
 
 5
 Because the lead concentrations exceeded state reporting limits,[6] plaintiff's environmental consultants informed the appropriate agencies of their findings. The Regional Water Quality Control Board ("RWQCB") assumed the role of lead agency and plaintiff coordinated its efforts with James Ross, the RWQCB's Site Cleanup Unit Chief. Although the parties dispute whether the RWQCB "ordered" remedial action at the property or merely concurred in plaintiff's "voluntary" decision to clean up the tar and slag contamination, its is undisputed that plaintiff's environmental consultants requested a "no further action" letter from the RWQCB before proposing cleanup and submitting a remedial action plan ("RAP").[7]
 
 
 6
 In the RAP, plaintiff proposed to remove the tar and slag material and impacted soils without addressing other areas of elevated TPH and lead contamination in the wetlands because the highest concentrations were associated with the tar and slag material. The RAP recommended post-cleanup levels of 1,000 ppm for TPH and 1,000 ppm TTLC/5 ppm STLC for lead. Ross approved the RAP subject to the condition that plaintiff bring TTLC lead values down to 50 ppm, rather 1,000 ppm.[8]
 
 
 7
 The cleanup went forward in the summer of 1995 and overthe course of five days 1,042 tons of material were removed, varying in depth from one to four feet and covering an area approximately 75 feet by 160 feet. In all but four of the soil samples taken after the excavation, TPH and lead levels were within the established limits.[9] After a site visit and independent soil testing by RWQCB staff, Ross sent a closure letter stating:
 
 
 8
 the removal is complete to the extent required by this Board. . . . [W]e have concluded that all the require ments established by this Board in our RAP approval letter dated February 27, 1995, have been complied with. In addition, the contamination has been suc cessfully removed and the remaining soil in the bot tom of the watercourse poses no further threat to surface waters of the State. We, therefore, conclude that no further action is required at this site.
 
 
 9
 Within a year of the "no further action letter, " plaintiff filed suit against the Partnership Defendants, the Government Defendants, and Unocal, seeking to recover the costs of its remedial action as well as damages arising from its inability to refinance the property.[10] On cross-motions for summary judgment the district court rejected all of plaintiff's theories of recovery. See Carson Harbor Village, Ltd. v. Unocal Corp., 990 F. Supp. 1188 (C.D. Cal. 1997). On the CERCLA claim, the district court held that plaintiff could not show that its remedial action was "necessary" within the meaning of 42 U.S.C. 9607(a)(4)(B) because there was no evidence of an "actual and real threat" to human health or the environment and (implicitly referring to plaintiff's quest for refinancing) "CERCLA . . . was not designed to permit property owners to clean up their property unnecessarily for business reasons, and then to shift the costs to prior owners." 990 F. Supp. at 1193. The district court focused on Ross's deposition testimony that the remediation plan was initiated by plaintiff and that the RWQCB would not have required remedial action but for plaintiff's proposal. Ross's testimony is directly controverted by the testimony and memoranda of others who were at the site meetings when remedial options were discussed, but the district court excluded this evidence as inadmissible hearsay. Id. at n.4. As to the Partnership Defendants, the district court ruled that plaintiff failed to show a "disposal" of hazardous substances during their time of ownership--a prerequisite to prior owner liability under 42 U.S.C. 9607(a)(2). The court held that there was no direct evidence of lead-containing storm water entering the property at any time before 1994 and the court rejected the argument that migration of lead and TPH from the tar and slag into the wetlands soil constituted a "disposal." Id. at 1194-95.
 
 
 10
 With respect to the common law claims of nuisance, trespass, and injury to easement against the Government Defendants, the district court held that California Civil Code 3482 provides a complete defense since from 1990 forward the storm water runoff systems were covered by National Pollu-tant Discharge Elimination System ("NPDES") permits issued pursuant to the Clean Water Act, and prior to 1990 there was no direct evidence of lead-containing runoff. Id. at 1197. Finally, as to the claim for express indemnity under the purchase agreement with the Partnership Defendants, the court reasoned that since the cleanup was not required by the RWQCB, plaintiff had not discharged an obligation of the Partnership Defendants. The indemnity provision covered only losses resulting from "any liability or obligation of seller which buyer is not specifically required to assume hereunder." Id. at 1198 (quoting indemnity provision).
 
 II. STANDARD OF REVIEW
 
 11
 A grant of summary judgment is reviewed de novo. Robi v. Reed, 173 F.3d 736, 739 (9th Cir. 1999), cert. denied, 120 S. Ct. 375 (1999). Our review is governed by the same standard applied by the trial court under Federal Rule of Civil Procedure 56(c). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Robi, 173 F.3d at 739.
 
 
 12
 "Whether the district court correctly construed the hearsay rule is a question of law reviewed de novo." United States v. Bao, 189 F.3d 860, 863 (9th Cir. 1999) (citation omitted). However, "[w]e review for abuse of discretion the trial court's decision to exclude evidence under the hearsay rule. " Id. at 864.
 
 III. DISCUSSION
 A. CERCLA
 1. Necessary Costs of Response
 
 13
 A private party seeking to recover the costs of cleaning up hazardous waste has the burden of proving:
 
 
 14
 (1) the site on which the hazardous substances are contained is a "facility" under CERCLA's definition of that term, 42 U.S.C. 9601(9);
 
 
 15
 (2) a "release" or "threatened release " of any "haz ardous substance" from the facility has occurred, 42 U.S.C. 9607(a)(4);
 
 
 16
 (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contin gency plan," 42 U.S.C. 9607(a)(4) and (a)(4)(B); and
 
 
 17
 (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a).
 
 
 18
 3550 Stevens Creek Assoc. v. Barclays Bank of California, 915 F.2d 1355, 1358 (9th Cir. 1990) (citing Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1152 (9th Cir. 1989)).
 
 
 19
 In order to reach the conclusion that plaintiff's response costs were not "necessary" within the meaning of 42 U.S.C. 9607(a)(4)(B), the district court followed G.J. Leasing Co., Inc. v. Union Electric Co., 854 F. Supp. 539 (S.D. Ill. 1994), aff'd, 54 F.3d 379 (7th Cir. 1995), and Yellow Freight System, Inc. v. ACF Indus., Inc., 909 F. Supp. 1290 (E.D. Mo. 1995). Appellees also cite Foster v. United States, 922 F. Supp. 642 (D.D.C. 1996), in support of the district court's holding.
 
 
 20
 In G.J. Leasing, the seminal case followed in Yellow Freight and Foster, the district court considered a CERCLA claim brought by a company that purchased a power plant and decided to convert the plant buildings into a warehouse, transportation terminal, and office space. The salvage company hired to dismantle and remove the plant machinery exposed widespread asbestos contamination in the buildings and the new owners decided to have the asbestos removed in order to accommodate the new uses. The owners then filed a cost recovery action against the power company.
 
 
 21
 Following a bench trial, the district court held that none of the removal costs were " `necessary' costs of response as that term is intended under CERCLA." G.J. Leasing , 854 F. Supp. at 563. The court admonished that "Congress did not intend CERCLA to make injured parties whole or to create a general vehicle for tort actions." Id. at 561 (citations omitted). Thus:
 
 
 22
 In order to show that any response costs were neces sary under CERCLA, plaintiffs must demonstrate that they responded to a threat to public health or the environment. Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 669-70 (5th Cir. 1989); Louisiana-Pacific Corp. v. ASARCO, Inc., 735 F. Supp. 358, 362 (W.D. Wash. 1990). A theoretical threat is not enough. For response costs to be "necessary," plain tiffs must establish that an actual and real public health threat exists prior to initiating a response action. See, e.g., Matter of Bell Petroleum Services, Inc. 3 F.3d 889, 904-06 (5th Cir. 1993). To show that costs incurred were "necessary" under CER CLA, a party must show (1) that the costs were incurred in response to a threat to human health or the environment, and (2) that the costs were neces sary to address that threat. Artesian Water Co. v. Government of New Castle County, 659 F. Supp. 1269, 1278 (D. Del. 1987).
 
 
 23
 Id. at 561-62. Applying this standard to the asbestos removal, the court went on to hold that the response costs incurred by the new owners were not necessary because there was evidence that the remediation was motivated by business reasons (i.e., the desire to convert the property to new uses) as opposed to "an actual and real public health threat," there was no evidence that asbestos in the building would reach the outside environment, and employee exposure to asbestos is not a threat redressible under CERCLA. Id. at 562-63 ("In this case the evidence established that plaintiffs had other business reasons for undertaking site investigations and abatement actions. To the extent that these actions were taken for purposes other than responding to an actual and real public health threat, there is no CERCLA liability.") (emphasis added).[11]
 
 
 24
 Here the district court followed the G.J. Leasing ulterior motive analysis, emphasizing Ross's testimony that the RWQCB would "not likely" have required remediation if Carson Harbor had not come forward with a plan. Ross testified as follows:
 
 
 25
 Q: Now, I've got another hypothetical question: If the owners had not come to you with a remediation plan, if they had simply reported to you that this is what we see here, would you have required them to develop some remediation plan?
 
 
 26
 Ross: Not likely.
 
 
 27
 Q: As far as you were concerned, this stuff, even the slag and tar-like material, could have just stayed there?
 
 
 28
 Ross: Very likely.
 
 
 29
 Q: So then, basically, this remediation was done at their initiative for their own reasons and not because of any environmental or health problem that was perceived by the Regional Board?
 
 
 30
 Ross: Yes.
 
 
 31
 See Carson Harbor, 990 F. Supp. at 1193.
 
 
 32
 There are three flaws in the district court's analysis. First, however well the ulterior motive analysis fits the facts of G.J. Leasing and its progeny, we decline to endorse it as a factor of any significance in the determination whether costsare incurred in response to a palpable threat to human health or the environment. In the private cost recovery context, the plaintiff with no business or financial motive for investigating and cleaning up a site will be rare indeed. Thus a court must focus on the nature of the threat presented by the contamination at issue and whether the response action is addressed to that threat. These are factual questions requiring attention to the objective circumstances of each case, not a party's subjective intent. See Cadillac Fairview/California, Inc. v. Dow Chemical Co., 840 F.2d 691, 695 (9th Cir. 1988) (recognizing that necessity is a factual question). That Carson Harbor discovered contamination and acted to remedy it as part of an effort to secure financing is immaterial so long as there is evidence that the contamination presented a palpable threat to human health or the environment.
 
 
 33
 Second, although the district court correctly noted that "costs associated with voluntary remediation efforts are recoverable," Carson Harbor, 990 F. Supp. at 1193, its focus on whether the RWQCB would have ordered cleanup incorrectly suggests that agency inaction is dispositive on the question whether contamination presents an environmental risk worthy of response. In NL Indus., Inc. v. Kaplan , 792 F.2d 896, 898 (9th Cir. 1986), we held that response costs can be "necessary" even though the agency that required cleanup never approved the response actions taken. And in Cadillac Fairview, where the agency merely "requested [the property owner] to undertake certain steps to protect neighborhood residents," we held that "significant state or local government action need not precede a response action for that action to be either `necessary' or `consistent with the national contingency plan.' " 840 F.2d at 692, 694 (emphasis added); see id. at 695 ("[T]he district court erred in ruling that some governmental entity must authorize and initiate a response action for that action to be necessary and consistent with the national contingency plan."). NL Industries and Cadillac Fairview thus stand for the proposition that the absence of agency directives is not fatal to a cost recovery suit. That proposition is surely right. That a public agency fails or refuses to recognize an actionable threat obviously should not control given the institutional and financial constraints agency decisionmakers face. This is particularly so with respect to relatively minor contamination sites which are unlikely to capture the attention of public officials or warrant the devotion of scarce resources.[12]
 
 
 34
 Finally, it appears that the district court took an unnecessarily cramped view of the facts. A careful review of the record demonstrates that there are indeed genuine issues as to whether the RWQCB ordered the excavation of the tar and slag material and whether the identified contamination posed a legitimate threat. Ross's deposition testimony two years after the cleanup that he did not require remediation is contradicted by the testimony of Carson Harbor's environmental consultant as well as correspondence contemporaneous with the cleanup memorializing Ross's comments at the site meetings.[13] The district court excluded this evidence as hearsay, but the evidence falls squarelywithin the "basic rule of evidence . . . that prior inconsistent statements may be used to impeach the credibility of a witness." United States v. Hale, 422 U.S. 171, 176 (1975). As we have held:
 
 
 35
 A prior inconsistent statement is admissible to raise the suggestion that if a witness makes inconsistent statements, then his entire testimony may not be credible; such an inference does not depend on whether either the prior statement or the subsequent in-court statement is true. Therefore, because a declarant's prior inconsistent statement is not offered for its truth, it is not hearsay.
 
 
 36
 Bao, 189 F.3d at 866 (citing United States v. Arteaga, 117 F.3d 388, 397 n.18 (9th Cir. (1997)). Once Ross's prior inconsistent statements are admitted, the credibility of his deposition testimony is drawn into question and a jury question arises as to whether he ordered the cleanup or perceived an environmental threat.
 
 
 37
 Ross's testimony is further undermined by other admissible evidence suggesting that Carson Harbor acted subject to RWQCB mandates. First and foremost, in the same deposition in which he answered the hypothetical question, Ross conceded that lead contamination from the tar and slag material presented a threat to both surface and groundwater,[14] and that, under the RWQCB's general standards, lead contamination above 5 ppm (STLC) "would require something to be done." But, quite apart from Ross's post hoc statements, the RWQCB's overall course of conduct makes clear that it perceived an environmental threat worthy of remedial action. At the most basic level, if remedial action was truly unnecessary there was no reason for the agency to withhold the no further action letter Carson Harbor's consultants requested shortly after sending the initial notice of contamination on the property--no reason to invest all the time and energy supervising a costly remediation. And once the RAP was proposed, the RWQCB did not simply sign off on the consultant's recommended cleanup levels. Instead, the agency conditioned site closure on even lower lead levels, presumably to ensure proper mitigation of a perceived threat to public health or the environment. Moreover, when the cleanup was complete, the agency sent its own staff to the site to verify that the specifications of the RAP approval had been met before issuing a nofurther action letter, and the letter specifically predicates closure on a finding that "the remaining soil in the bottom of the watercourse poses no further threat to surface waters of the State." (Emphasis added). Drawing all inferences in favor of the plaintiff, as we must, we are bound to conclude that the district court erred in finding that there was insufficient evidence of an environmental threat and that Carson Harbor's response costs were unnecessary.
 
 2. Active/Passive Disposal
 
 38
 CERCLA creates four categories of potentially responsible parties ("PRP's"):
 
 
 39
 (1) the owner and operator of a vessel or a facility;
 
 
 40
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of; (3) any person who by contract, agreement, or oth erwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or pos sessed by such person, by any other party or entity at any facility or incineration vessel owned or oper ated by another party or entity and containing such hazardous substances, and
 
 
 41
 (4) any person who accepts or accepted any haz ardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person . . . .
 
 
 42
 42 U.S.C. 9607(a)(1)-(4). Only a party who falls within one of these classes is subject to liability under the statute.[15]
 
 
 43
 The district court ruled that the Partnership Defendants were not PRP's under 9607(a)(2) because there was no evidence of a "disposal" between 1977 and 1983 when they held the property. To reach this conclusion the court rejected plaintiff's claim that the spread of contamination from the tar and slag material into the surrounding soil constituted a "disposal." As the court reasoned:
 
 
 44
 While CERCLA was intended to reach broadly, it also clearly expresses limits to the contemplated stat utory liability. To find otherwise would subject pre vious owners who had no knowledge of or control over hazardous substances on their property to liabil ity under the statute. This result is in stark conflict with the intent of CERCLA, which is to affix the ultimate cost of cleaning up disposal sites on the par ties responsible for the contamination.
 
 
 45
 Carson Harbor, 990 F. Supp. at 1195 (citation omitted).
 
 
 46
 There is a circuit split on the question whether the statutory definition of disposal encompasses passive migration of hazardous substances, compare Nurad, Inc. v. William Hooper & Sons Co., 966 F.2d 837, 844-46 (4th Cir. 1992) ("disposal" includes passive migration); with United States v. 150 Acres of Land, 204 F.3d 698, 705-06 (6th Cir. 2000) ("disposal" requires active human conduct); ABB Indus. Sys. Inc. v. Prime Technology, Inc., 120 F.3d 351, 357-59 (2d Cir. 1997)(same); United States v. CDMG Realty Co., 96 F.3d 706, 71318 (3d Cir. 1996) (same), and we have yet to weigh in on the issue. See Kaiser Aluminum & Chemical Co. v. Catellus Development, 976 F.2d 1338, 1342 n.7 (9th Cir. 1992).[16]
 
 
 47
 As with any question of statutory construction, we begin with the language and structure of the statute. CERCLA states that the term "disposal" shall have the meaning provided in RCRA. 42 U.S.C. 9601(29). According to RCRA:
 
 
 48
 The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the envi ronment or be emitted into the air or discharged into any waters, including ground waters.
 
 
 49
 42 U.S.C. 6903(3). The argument that this definition encompasses passive migration is straightforward. First, at least three of the listed terms have well-recognized passive meanings. A hazardous waste may plainly "discharge," "spill," or "leak," without any active human participation. Although other courts have focused on "spill" and "leak," the passive meaning of "discharge" is especially broad. See Webster's Third New International Dictionary 644 (Philip Babcock Gove & the Merriam-Webster Editorial Staff, eds. 1993) (defining discharge as "to give outlet to: pour forth: emit . . . to release or give vent to . . . to emit or give vent to fluid or other contents"). As in Nurad, "[t]he district court arbitrarily deprived these words of their passive element by imposing a requirement of active participation as a prerequisite to liability." 966 F.2d at 845. Since the prescribed definition includes passive migration by its own terms, we are bound to give effect to that definition. See Meese v. Keene , 481 U.S. 465, 484-85 (1987); Sutherland, 2A STATUTES & STATUTORY CONSTRUCTION 47.07 at 152 (5th ed. 1992) ("As a rule, a definition which declares what a term means is binding upon the court.").
 
 
 50
 Second, in the context of RCRA--the statute from which the definition of disposal is imported--the Fourth Circuit squarely rejected the "strained reading" that would limit disposal to active human conduct. United States v. Waste Indus., Inc., 734 F.2d 159, 164-65 (4th Cir. 1984). And we have previously rejected a PRP's invitation to enforce a "crabbed interpretation" of disposal. See Kaiser Aluminum, 976 F.2d at 1342 (following Fifth Circuit and holding that " `disposal' should not be limited solely to the initial introduction of hazardous substances onto property. Rather, consistent with the overall remedial purpose of CERCLA, `disposal' should be read broadly to include the subsequent`move[ment], dispers[al], or release[ ][of such substances] during landfill excavations and fillings.' ") (quoting and following Tanglewood East Homeowners v. Charles-Thomas, Inc. , 849 F.2d 1568, 1573 (5th Cir. 1988)) (modifications in original).
 
 
 51
 Finally, including the passive meaning of the statutory definition coheres with the structure and purpose of CERCLA's liability provisions. As this court has observed:
 
 
 52
 CERCLA was enacted to "provide for liability, com pensation, cleanup, and emergency response for haz ardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." Pub. L. No. 96-510, 94 Stat. 2767 (1980). It generally imposes strict liability on owners and oper ators of facilities at which hazardous substances were disposed.
 
 
 53
 3550 Stevens Creek, 915 F.2d at 1357; see id. at 1363 (emphasizing "that [CERCLA] is to be given a broad interpretation to accomplish its remedial goals") (citing First United Methodist Church v. U.S. Gypsum Co., 882 F.2d 862, 867 (4th Cir. 1989); Wickland Oil Terminals v. ASARCO, 792 F.2d 887, 891-92 (9th Cir. 1986)). Thus, while the statute was surely designed, as the district court noted, to impose the costs of cleanup on "responsible parties," the imperative was to create a mechanism for prompt cleanup and Congress was well aware that many directly responsible parties were insolvent or no longer in existence. For that reason, traditional causation requirements were abandoned in favor of a strict liability regime. The categories of PRP's incorporated in the liability provisions are correspondingly broad, sweeping in parties who may have done nothing affirmatively to contribute to contamination at a site and forcing them to disprove causation as an affirmative defense. See 42 U.S.C. 9607(b)(3). Including as PRP's owners who held land while waste passively migrated through the property is entirely consistent with this liability regime. As the Fourth Circuit held in Nurad:
 
 
 54
 The district court's view of the CERCLA definition of disposal is also at odds with CERCLA's strict lia bility emphasis. The trigger to liability under 9607(a)(2) is ownership or operation of a facility at the time of a disposal, not culpability or responsi bility for the contamination. See United States v. Monsanto, 858 F.2d 160, 167 (4th Cir. 1988) ("The traditional elements of tort culpability on which the site-owners rely simply are absent from the stat ute."); New York v. Shore Realty Corp., 759 F.2d 1032, 1044 (2d Cir. 1985) (noting that Congress spe cifically rejected a causation requirement). We must decline therefore to engraft onto the statute additional prerequisites to the reimbursement of response costs which Congress did not place there.
 
 
 55
 966 F.2d at 846 (holding that leaking mineral spirits from an underground storage tank constituted "disposal " under 9607(a)(2)).
 
 
 56
 We are not dissuaded from reaching this conclusion by the thoughtful opinion of the Third Circuit in CDMG or its progeny. Briefly, in CDMG the Third Circuit highlighted a number of irrationalities that apparently result from giving "disposal" a passive meaning. First, according to the canon noscitur a sociis, "leak" and "spill " must be read together with the surrounding words in the definition, all of which "envision a human actor." 96 F.3d at 714. Reading "leak" and "spill" as passive when the surrounding words are active undermines the coherence of the list. Second, giving "disposal" a passive meaning makes the term synonymous with "release," which Congress explicitly defined to include not only "disposal" but terms typically used to describe passive migration such as "leaching." Id. at 714-15 ("Congress' use of the term `leaching' in the definition of `release' demonstrates that it was aware of the concept of passive migration in landfills and that it knew how to explicitly refer to that concept. Yet Congress made prior owners liable if they owned land at the time of `disposal,' not at the time of `release.' ").[17] Third, the reference to the "time of disposal" in 9607(a)(2) is arguably an awkward means of creating liability for all owners "after the introduction of waste into the facility," if that is all Congress meant to do. Id. at 715. Fourth, if "disposal" includes passive migration, the so-called innocent landowner defense would be rendered meaningless since no one could show that he or she acquired the property "after disposal." Id. at 716; see also 42 U.S.C. 9601(35)(A) (defendant asserting innocent landowner defense must show that "the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility"). Finally, under a passive reading of "disposal," prior owners who had no knowledge that their land was contaminated would fall within the statute's liability provisions. According to the Third Circuit and the district court here, this would not serve the purpose of "forc[ing] polluters to pay the costs associated with their pollution." CDMG, 96 F.3d at 717 (citations omitted); Carson Harbor, 990 F. Supp. at 1195.
 
 
 57
 Even if we were to concede that these concerns do indeed arise from reading "disposal" to include passive migration, it is far from obvious that an "active-only" interpretation must prevail. Even the CDMG court recognized that"[b]ecause of the great haste with which CERCLA was passed, inconsistencies and redundancies pervade the statute." 96 F.3d at 715 n.5 (citing United States v. Alcan Aluminum Corp. , 964 F.2d 252, 258 n.5 (3d Cir. 1992)). Thus, when interpreting CERCLA, the identification of inconsistency or redundancy in the statute is not necessarily fatal to a given construction. Nor can one automatically assume that a construction that appears to resolve inconsistencies or avoid redundancies is consonant with the intended design of the statute, especially if the "saving" construction merely substitutes one form of inconsistency or redundancy for another.
 
 
 58
 Returning to the CDMG court's reasoning, however tidy the application of noscitur a sociis renders the definition of "disposal," it conflicts with the plain meaning of the passive terms included in the definition. Moreover, insofar as the canon operates to narrow the definition of "disposal," it also conflicts with the well established principle that remedial statutes are to be broadly construed to effectuate their salutary purposes. See Louisiana-Pacific Corp. v. ASARCO, Inc., 24 F.3d 1565, 1575 (9th Cir. 1994). If, as we will see, the narrow reading eliminates liability for certain prior owners while other similarly situated owners are covered as PRP's, the reading must be rejected.[18]
 
 
 59
 As for the redundancy of "release" and "disposal," it has long been recognized that "[i]t is not possible to interpret these two definitions without some degree of inconsistency" because both definitions share terms. United States v. Petersen Sand & Gravel, Inc., 806 F. Supp. 1346, 1351 n.2 (N.D. Ill. 1992). "Whereas `release' includes `disposal,' the definition of `disposal' includes component events that are also included in the definition of `release.' " Id.[19] The question is whether Congress intended to avoid the particular redundancy that would result from reading "disposal" in accordance with the passive terms in its definition and whether this particular redundancy is one we should care about. As elsewhere, we are left to infer answers to these questions from the consequences that would result from alternative constructions. Because there is no indication that the operation of either term in the statute would be compromised (and the purposes of the statute are served by reading "disposal" to include passive migration), we reject the CDMG court's narrower construction.
 
 
 60
 The reference to "time of disposal" is neither awkward norsuperfluous under our reading. Rather, the time of disposal requirement draws an important distinction in CERCLA's otherwise capacious liability framework by making disposal a temporal trigger for prior owner liability: owners and operators who precede the disposal of hazardous substances are not covered by the Act, regardless of their knowledge that selling the property to a certain buyer (take, for instance, a company that operates landfills or hazardous waste sites) may result in contamination. The time of disposal requirement would certainly do more work under an active disposal interpretation since it would import a form of causation analysis into 9607(a)(2), but given that Congress pushed causation requirements as a general matter into the statutory defenses, we are loathe to assume that it intended anything unique in the liability provision governing prior owners and operators.
 
 
 61
 And contrary to the CDMG court's analysis, an active construction of "disposal" is not required to preserve the innocent landowner defense. The CDMG court reasoned that the innocent landowner defense would almost never apply under a passive migration theory "as there would generally be no point `after disposal.' " 96 F.3d at 716. But on its face, the innocent landowner defense applies if the property "was acquired after the disposal or placement of the hazardous substances." 42 U.S.C. 9601(35)(A) (emphasis added). Giving effect to Congress' explicit use of the disjunctive, and to the common meaning of "placement," this defense applies even though wastes were passively migrating during a defendant's ownership so long as he or she acquired the property after the hazardous wastes were first placed on the property.[20]
 
 
 62
 Finally, an active theory of "disposal" creates inconsistencies of its own. Under an active theory one must assume that Congress intended to create a major distinction between current and former owner/operators. Current owners are PRP's without regard to fault, but prior owners would be completely immune from suit if they did not own the property during an act of disposal. Even prior owners who knew or should have known that their property was contaminated and that the waste was spreading would be immune.[21] One must also assume that Congress intended to create an irrational distinction between prior owners. Owners who held property while contamination was passively migrating would be categorically exempt even if they (1) failed to conduct a reasonably diligent review of the environmental condition of their property (and thereby allowed readily discoverable contamination to worsen), or (2) simply allowed known, pre-existing contamination to remain untreated. On the other hand, prior owners at the time of an active disposal would be PRP's along with current owners even if they were in no way responsible for, or connected with, the disposal.
 
 
 63
 Here, the district court's endorsement of an active theory would completely immunize the Partnership Defendants. But there is very little to distinguish the current owner plaintiff from the Partnership Defendants. Both came into ownership long after the tar and slag material was "actively" disposed on the property, and neither directly caused any contamination by their use of the property as a mobile home park. Instead, both parties were owners while lead and TPH from the tar and slag discharged into the wetlands. The only significant distinction between the parties is that, during the Partnership Defendants' ownership, Unocal was still engaged in oil production on the property. Thus, if anything, the Partnership Defendants had more reason to be vigilant about the possibility of contamination from oil production. Yet by reading "at the time of the disposal" to require human agency, the Partnership Defendants would be completely exempt from liability for the cleanup costs incurred by Carson Harbor. Under a passive theory, by contrast, the Partnership Defendants are responsible parties unless and until they establish a statutory defense. A passive theory fits better with Congress' decision to eschew a causation-based liability framework and to ensure prompt cleanup by drawing in all "potentially responsible parties." Accordingly, we hold that "disposal " includes passive migration and that plaintiffs are entitled to proceed in their CERCLA claim against the Partnership Defendants.[22]
 
 3. Other CERCLA Issues
 
 64
 We decline to decide, in the first instance, all but one of the other issues raised by the Government Defendants to support summary judgment in their favor on the CERCLA claim.[23] The Government Defendants contend that since Carson Harbor only undertook removal of the tar and slag material and impacted soils, there is no causal nexus between the response costs incurred and any contamination due to storm water runoff. This argument fails because it has long been established that a plaintiff need not "fingerprint" wastes in order to recover. As the Fourth Circuit has held:
 
 
 65
 In deleting causation language from section 107(a), we assume as have many other courts, that Congress knew of the synergistic and migratory capacities of leaking chemical waste, and the technological infea sibility of tracing improperly disposed waste to its source. . . . See United States v. Wade, 577 F. Supp. 1326, 1332 (E.D. Pa. 1983) ("[T]o require a plaintiff under CERCLA to `fingerprint' wastes is to eviscer ate the statute.").
 
 
 66
 Monsanto, 858 F.2d at 170; see also Amoco Oil, 889 F.2d at 670 n.8 ("[I]n cases involving multiple sources of contamina-tion, a plaintiff need not prove a specific causal link between costs incurred and an individual generator's waste.") (citations omitted).
 
 
 67
 B. State Claims Against the Government Defendants
 
 
 68
 California Civil Code 3482 provides that"[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance." There was no error in the district court's decision that this provision precludes all of Carson Harbor's state law claims against the Government Defendants. California courts have read 3482 to preclude common law challenges to statutorily authorized conduct. See Farmers Ins. Exch. v. California, 175 Cal. App. 3d 494, 503 (1985); cf. Varjabedian v. City of Madera, 572 P.2d 43 (1977). Since the Government Defendants were issued NPDES permits in 1990 and 1996, and since there is no evidence of lead-containing storm water runoff to the property prior to 1994 (or a violation of the permits), summary judgment was properly granted as to these claims.
 
 
 69
 C. Express Indemnity From the Partnership Defendants
 
 
 70
 The district court granted summary judgment to the Partnership Defendants on Carson Harbor's claim for indemnity under the purchase agreement because it had already concluded that the cleanup was not necessary within the meaning of 42 U.S.C. 9607(a)(4)(B). The indemnity provision applies only if the Partnership Defendants would have been obliged to remove the hazardous substances in 1983. In view of our holding that there are genuine issues as to whether Carson Harbor's response costs were necessary, we reverse the grant of summary judgment on the claim for indemnity.
 
 IV. CONCLUSION
 
 71
 The district court's grant of summary judgment in favor of all defendants on the CERCLA claim is REVERSED. We also REVERSE the district court's grant of summary judgment for the Partnership Defendants on plaintiff's claim for indemnity under the purchase agreement. The case is REMANDED for further proceedings consistent with this opinion. All parties are to bear their own costs.
 
 
 72
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.
 
 
 [2]
 Plaintiff's causes of action under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. 6972(a), and the Clean Water Act ("CWA"), 33 U.S.C. 1365, also rejected by the district court, are not before this court on appeal.
 
 
 [3]
 The property is located within the Dominguez Oil Field in Los Angeles County.
 
 
 [4]
 Testing revealed the following concentrations:
 TPH Tar sample: 120,000 parts per
 million ("ppm")
 Slag sample: 35 ppm
 Underlying soil: 2,300 ppm
 Lead Tar sample: 1600 ppm (TTLC)
 Slag Sample: 590 ppm (TTLC) and
 12 ppm (STLC)
 Underlying soil: 2,300 ppm (TTLC) and
 86 ppm (STLC)
 "TTLC" refers to "total threshold limit concentrations," and "STLC" refers to the "soluble threshold limit concentrations." The latter reflects water soluble lead concentrations.
 
 
 [5]
 Upgradient testing revealed the following concentrations:
 TPH 13 to 560 ppm
Lead 11 to 220 ppm (TTLC) and
 0 to 23 (STLC)
 An off-site sample taken from the highway, 1,000 feet upstream from the tar and slag material, revealed TPH at 1,900 ppm and lead at 150 ppm (TTLC).
 
 
 [6]
 The mandatory reporting limits for lead are 1,000 ppm (TTLC) and 5 ppm (STLC).
 
 
 [7]
 On August 30, 1994, one month after reporting the contamination to the RWQCB, plaintiff's environmental consultant wrote to Ross: "Our goal in reporting [the contamination] to the Regional Board is to comply with the legal reporting requirements and also to obtain in writing any additional requirements that the Board may deem appropriate. If no further action is required, we would appreciate a letter so stating." No letter came. Instead, Ross met with the consultant at the property in October 1994 to discuss remedial options and an RAP was submitted to the RWQCB by January 1995.
 
 
 [8]
 Ross also stated that a health risk assessment would have to be performed and that, following cleanup, a no further action letter would cover only the tar and slag area.
 
 
 [9]
 In the four deviant samples, lead levels were still slightly above theTTLC and STLC limits. In the closure report, plaintiff's environmental consultant indicated that "[t]he elevated lead concentration at those locations may be attributed to a greater occurrence from the impacts of runoff" because the samples "were collected along the western edge of the excavation adjacent to the wetland portion of the stream channel."
 
 
 [10]
 Although Caltrans and James Van Loben Sels are also named in the complaint, they are not identified in any of the causes of action at issue in this appeal.
 
 
 [11]
 Yellow Freight is another asbestos abatement case. The owner of a former railroad car manufacturing plant decided to conduct asbestos abatement and PCB removal in the process of demolishing buildings to make the site suitable for trucking operations. 909 F. Supp. at 1299. Finding no evidence that the contamination was likely to reach the outside environment, and no evidence of "an immediate threat to public health or the environment," the court followed G.J. Leasing's ulterior motive analysis:
 [T]he evidence showed that Yellow Freight had business reasons for undertaking the investigation, sampling and abatement actions at the site . . . . To the extent Yellow Freight's actions were taken for purposes other than responding to a public health threat, it cannot establish that its costs expended were necessary under CERCLA.
 Id.
 Similarly, in Foster, the owner of contaminated land decided to remove hazardous waste only after a prospective purchaser abandoned negotiations upon discovering the contamination. Following G.J. Leasing's ulterior motive analysis, the court held that the costs incurred were unnecessary because they were not in response to a public health threat. 922 F. Supp. at 652-53 ("[T]he eventual decision to [act] was not taken in response to a perceived threat to health or the environment, but in order to further identify barriers to the development of the Site.").
 
 
 [12]
 This is not to say that government involvement is altogether irrelevant. As we held in NL Industries, where an agency requires action, the agency mandate is sufficient to demonstrate that the costs incurred pursuant to the mandate were necessary. 792 F.2d at 898 ("Kaplan has alleged that he was required by state and local agencies to incur the response costs that he seeks to recover from NL Industries. We find this allegation sufficient to support a claim that the incurrence of response costs was `necessary' under section 107(a)(2)(B) of CERCLA."). We simply hold that an agency's failure to act is not dispositive.
 
 
 [13]
 In his deposition, plaintiff's consultant, Dr. Hassan Amini, testified that "Mr. Ross said that the material needed to be removed . . . [in] concurrence with our recommendation." Dr. Amini's testimony is corroborated by two letters he sent to Ross while the RAP was under consideration. In the cover letter submitted with the RAP Dr. Amini said: "Since our field meeting with you, and in response to your request, we have collected additional soil samples surrounding the impacted area and have developed the attached remediation workplan for removal of thewaste material and impacted soil." (Emphasis added). And in a subsequent letter Dr. Amini again confirmed that "the remediation being undertaken by Carson Harbor Village, Ltd. is being required pursuant to our meeting, our conversations and in accordance with the [RWQCB's] Water Quality Plan to preserve and enhance water quality and protect the beneficial uses of all waters within the basin."
 Prior to the cleanup a Unocal representative who participated in the remediation plans also wrote an internal memorandum stating: "We met with Jim Ross of RWQCB and confirmed that he wants the `slag-like' and `tar-like' material removed from the creek bed."
 
 
 [14]
 Ross testified:
 Q: Do you agree that this project was a surface water qual ity protection issue?
 Ross: In part, yes.
 Q: What do you mean "in part"?
 Ross: Well, it also has the potential to be groundwater.
 Q: Okay. So do you think that there might be a threat to groundwater as a result of the contamination on the property?
 Ross: Certainly occurred to me.
 Q: What hazardous substances on the property did you think were a threat to groundwater?
 Ross: Lead primarily.
 Q: Did the levels of lead that were found on this property have the potential to get into the groundwater?
 Ross: Yes, the soluble lead.
 
 
 [15]
 Because a PRP may be eligible for one or more of the defenses set forth in 42 U.S.C. 9607(b), one's status as a PRP is a necessary but not sufficient condition of CERCLA liability.
 
 
 [16]
 District courts within the Ninth Circuit are divided on the question. Compare Carson Harbor, 990 F. Supp. 1188 (C.D. Cal. 1997) ("disposal" requires active human conduct) and Ecodyne Corp. v. Shah, 718 F. Supp. 1454, 1456-57 (N.D. Cal. 1989) (same), with Stanley Works v. Syndergeneral Corp., 781 F. Supp. 659, 662-64 (E.D. Cal. 1990) ("disposal" includes passive migration).
 
 
 [17]
 According to 42 U.S.C. 9601(22):
 The term "release" means any spilling, leaking, pumping, pour ing, emitting, emptying, discharging, injecting, escaping, leach ing, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollu tant or contaminant) . . . .
 
 
 [18]
 In any event, the CDMG court does not appear to have been completely convinced of its noscitur a sociis argument. The court said only that "Congress may have intended active meanings of `leaking' and `spilling.' " 96 F.3d at 714 (emphasis added). The court went on to distinguish Nurad not on the theory that the Fourth Circuit wrongly interpreted disposal to include passive migration, but rather on the narrower ground that although disposal must include "leaking" from an underground storage tank, as in Nurad, disposal clearly does not include the gradual spread ofwastes through a landfill. Id. All very well, except that in conceding that some forms of passive migration are indeed covered by the passive terms in the statute, the entire foundation of the court's analysis is undermined --all the inconsistencies and redundancies identified as reasons to avoid a passive reading are present under its own reading. The court also completely ignored the passive connotation of discharge.
 
 
 [19]
 Tellingly, as we have seen, the common definition of "discharge" includes "release." Other terms in the statute present similar conundrums. Compare, for instance, CERCLA's use of the terms "hazardous substance" and "hazardous waste" on the question whether CERCLA covers the voluntary removal of hazardous building material from a commercial building under the prior owner provision. See 3550 Stevens Creek, 915 F.2d at 1359-65 (building materials containing hazardous substances not "disposed" under 42 U.S.C. 9607(a)(2) until disposed "as waste").
 
 
 [20]
 The CDMG court dismisses the disjunctive reference to placement on the grounds that it is redundant since the definition of disposal includes placement. 96 F.3d at 716 n.7. However, the redundancy is avoided by assuming that Congress meant what it said--i.e., that a defendant need only show that he or she purchased the property either (1) after disposal or (2) after placement.
 
 
 [21]
 This argument assumes without deciding that the innocent landowner defense is equally available to current and former owners and that nothing in 42 U.S.C. 9601(35)(C) creates liability beyond the class of PRP's established in 9607(a). Compare CDMG, 96 F.3d at 716-17 (noting that innocent landowner defense may not be available to prior owners under 42 U.S.C. 9601(35)(C)), with ABB Industrial, 120 F.3d at 358 (citing Westwood Pharmaceuticals v. National Fuel Gas Dist. Corp., 964 F.2d 85, 91 (2d Cir. 1992), for proposition that the innocent landowner defense is available to prior owners). But because the liability provisions speaks to owners and operators, the argument would not be diminished even if our assumptions regarding the innocent landowner defense were unwarranted.
 
 
 [22]
 We find no error, however, in the district court's conclusion that Carson Harbor failed to raise a genuine issue of fact on the question of active migration during the Partnership Defendants' ownership of the property. The record shows that the tar and slag was dumped in the wetlands area long before 1977 when the Partnership defendants purchased the property. Moreover, there was no evidence that lead-containing storm water runoff reached the property between 1977 and 1983, and the district court properly declined Carson Harbor's invitation to assume (by taking judicial notice) that lead-containing runoff reached the property during those years.
 
 
 [23]
 We leave it to the district court to resolve on remand the Government Defendants' additional claims that plaintiff's response costs were not consistent with the national contingency plan ("NCP"), that federally permitted releases are exempt from CERCLA coverage under 42 U.S.C. 9607(j), and that the third party defense applies. Although we will generally uphold summary judgment on any ground supported by the record, thethird party defense and the federally permitted release exemption are affirmative defenses as to which the Government Defendants bear the burden of proof--a burden they have failed to meet on the record before this court. Moreover, we decline to take up the Government Defendants' passing reference to the NCP consistency issue. We have not only held that substantial compliance is sufficient to establish that response costs were incurred consistent with the NCP, see Louisiana-Pacific, 24 F.3d at 157576; NL Indus., 792 F.2d at 898-99 ("consistency with the national contingency plan does not necessitate strict compliance with its provisions"); Wickland Oil, 792 F.2d at 891 (observing that "response costs incurred by a private party may be `consistent with the national contingency plan' so long as the response measures promote the broader purposes of the plan"), we have emphasized that consistency is a question of fact "to be determined at the damages stage of a section 107(a) action," see Cadillac Fairview, 840 F.2d at 695, and is therefore best suited to resolution at trial, unless there is no question that costs were incurred in violation of the NCP. On the record before this court, we cannot say that Carson Harbor failed to comply with the 1990 requirements of the NCP.
 
 
 
 73
 WEINER, Senior District Judge, dissenting in part:
 
 
 74
 While I join Parts I, II, III A 1, III B and III C of the panel opinion, I cannot agree that CERCLA liability extends to the so-called passive migration of hazardous wastes. Accordingly, I dissent from Part III A 2.
 
 
 75
 In adopting the passive migration theory, first espoused eight years ago by the Fourth Circuit in Nurad, Inc. v. William Hooper & Sons Co., 966 F.2d 837 (4th Cir. 1992), but finding no adherents since, the panel opinion casts this Circuit's lot with a distinctly minority view of CERCLA liability. To date, each circuit to have discussed Nurad has rejected its reasoning and its result. See United States v. CDMG Realty Co., 96 F.3d 706 (3d Cir. 1996); ABB Industrial Systems v. Prime Technology, Inc., 120 F.3d 351 (2dCir. 1997); United States v. 150 Acres of Land, 204 F.3d 698, 705-06 (6th Cir. 2000). The reason for this seems clear to me. As stated by the Third Circuit in CDMG Realty, "[a] thorough examination of the text and structure of CERCLA convinces [me] that the passive migration of contaminants alleged here does not constitute disposal [as that term is used in 42 U.S.C.S 6903(3) and 9607(a)(2)]." 96 F.3d at 713.
 
 
 76
 To be considered a potentially responsible party under CERCLA, one must be "the owner or operator at the time the hazardous substances were disposed" on the property. Section 9607(a)(2). "Disposal," in turn, is defined as the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water." Section 6903(3). Nurad held that, under 9607(a), a landowner can be held to have disposed of hazardous material if he passively allowed that material to migrate in theenvironment during his ownership. Nurad, 966 F.2d at 846 ("Thus, we hold that 9607(a)(2) imposes liability not only for active involvement in the `dumping' or `placing' of hazardous waste at the facility, but for ownership of the facility at a time that hazardous waste was `spilling' or`leaking.' ").[1]
 
 
 77
 To my mind, however, none of the words contained in the section can be construed to have a passive connotation. While the panel opinion attempts to define some of the various verbs found in the statute to imply passive migration -specifically discharge, spill and leak -I believe that the statutory scheme requires that even these verbs be understood to imply some kind of active human conduct. Accord, CDMG Reality 96 F.3d at 714 ("We think there is a strong argument, however, that in the context of this definition, `leaking' and `spilling' should be read to require affirmative human action."). To me, something "spills" only when it is actively emptied or, because of human action or inaction, is placed in a position where gravity, or the elements taking their natural course, cause the contents to be emptied into the environment. In the dictionary, spill is defined in its verb tense as "to cause or allow to pour, splash, or fall out. Webster's Third New International Dictionary, Unabridged 2195 (Philip Babcock Gove & the Merriam-Webster Editorial Staff eds., 1986). Whether a substance pours, splashes or falls, human conduct was necessary ab initio to create the situation permitting the spill to occur, and it is this conduct with which I believe the statute is concerned.
 
 
 78
 In its verb tense, "leak" is defined as "to permit to enter or escape through a leak." Id. at 1285. Even an accidental leak requires human activity to cause it. Whether one let a metal drum rust to the point of leakage or fails to ensure the container is leakproof before it is filled, leaks don't occur without someone actively placing the hazardous waste in the container and creating the conditions under which it could, with the passage of time, begin to escape.
 
 
 79
 "Discharge" arguably requires less human interaction to occur than does a spill or a leak since discharge can be a naturally occurring event. For example, spring water can discharge from the earth under its own pressure. I believe that this is the sense that the majority uses when it notes that "discharge" can be defined as "to give outlet or vent to: emit." But in the sense the word is used in the statute, I believe a discharge, to be actionable under CERCLA, must also result from active human conduct. Congress must have intended "discharge" to be read in pari materia with the other verbs and to be defined in the sense most applicable to the evil CERCLA seeks to prevent. Thus, I believe Congress also intended that the definition of discharge be limited to "unload or empty," or "to pour forth contents," both of which implyactive conduct.
 
 
 80
 The statutory distinction between "disposal" and "release" supports this limitation. Release is a broader term than disposal since disposal is included within the definition of release. Compare 42 U.S.C. 9601(22) withS 9601(29). As the Sixth Circuit stated quite recently in 150 Acres of Land, it makes more sense for the statutory scheme, as well as the words themselves, to have disposal stand for activity that precedes the entry of a substance into the environment and release stand for the actual entry of the substance. 204 F.3d 698, 705-06 (6th Cir. 2000) (rejecting the passive migration theory). While Congress chose to include within the definition of release the passive activity of "leaching, " no such obviously passive term is included in the definition of disposal.
 
 
 81
 While the majority argues that the definition of potentially responsible party (PRP) is broad, leaving defendants to prove the absence of a causal role as an affirmative defense, I believe this puts the cart before the statutory horse. Congress intended strict liability only for PRPs and offered a specific definition of that term which incorporates only the disposal requirement. If Congress had intended those who own property on which hazardous substances passively migrated to be considered PRPs, it easily could have written the PRP definition to include those who owned or operated property at the time the hazardous substance was "released" as well as when it was disposed. Congress' failure to do so, I believe supports the position now accepted by the Second, Third and Sixth Circuits that some active human conduct is required to demonstrate disposal.[2]
 
 
 82
 In conclusion, I would hold that one who merely owns a site upon which previously dumped chemicals or, in this case, naturally occurring lead contamination has spread, does not meet the definition of a potentially responsible party. A passive migration theory, permitting an otherwise non responsible party to be held liable, fails to comport with the overriding legislative intent to place strict liability upon those who created the pollution. Kaiser Aluminum v. Catellus Development Corp., 976 F.2d 1338, 1340 (9th Cir. 1992) (one of CERCLA's primary goals was to affix the ultimate cost of clean up to those parties responsible for the contamination; we construe CERCLA liberally to achieve that goal.) As the district court correctly determined that the Partnership Defendants could not be held liable under a passive migration theory, I would find no error in its reason for granting these defendants summary judgment on the CERCLA claim.
 
 
 
 Notes:
 
 
 [1]
 In Nurad, the prior owners of a property, Hooper and Mumaw, wereheld liable under CERCLA for cleanup costs incurred by the incumbent owner Nurad. Hooper had installed underground storage tanks (USTs) which he used to store mineral spirits used in textile finishing. The USTs leaked and the mineral spirits were found in surrounding soils. Although the district court concluded that Hooper was liable because he had disposed of the mineral spirits and then abandoned them in the USTs, it held that Mumaw was not liable, even though passive migration of hazardous substances may have occurred during his ownership, because Mumaw had no active role in managing the tanks or their contents. The Fourth Circuit concluded that the district court had taken a too narrow view of the word "disposal" as used in 9607(a)(2), limiting it to disposal by affirmative human conduct. Nurad, 966 F.2d at 844. The Fourth Circuit found the district court's restrictive interpretation to be at odds with CERCLA's fundamental remedial purpose and the language of the statute. Id.
 
 
 [2]
 Noting that CERCLA provides for an "innocent owner" defense, 9607(b)(3), 9601(35), the CDMG Reality court added that if "disposal" were defined to include the gradual spread of waste after a spill, the innocent owner defense would be almost a nullity. 96 F.3d at 716. Since the innocent owner defense appears to be unavailable to a prior owner, see Id. at 716-17; 9601(35)(C) ("[n]othing in this paragraph . . . shall diminish the liability of any previous owner"), the court found that "if prior owners were liable because waste spread during their tenure. . . , prior owners could be in a significantly worse position than current owners: they would be liable for passive migration of waste" in circumstances where current owners could establish the innocent owner defense. Id. This it believed further supported the conclusion that disposal could not include passive migration. Id. The Second Circuit in ABB agreed with the Third Circuit's lengthy analysis, adopting most of its reasoning and conclusions. The Second Circuit was persuaded by the Third Circuit's reasoning which it fully adopted save for one caveat. While the CDMG court found that the innocent owner defense was not available to prior owners, the Second Circuit had previously rejected that conclusion in Westwood Pharmaceuticals v. National Fuel Gas Distribution Corp., 964 F.2d 85, 91 (2d Cir. 1992). Nonetheless, the Second Circuit found the other arguments set out in the CDMG opinion persuasive and rejected the passive migration liability theory.